FREDERICKA HOMBERG WICKER, JUDGE
Defendant, Raymond M. Clay, appeals his conviction for possession of a firearm by a convicted felon, a violation of La. R.S. 14.95.1. For the reasons assigned, we reverse the trial court's ruling denying defendant's motion to suppress the evidence, vacate defendant's conviction and sentence, and remand the matter for further proceedings consistent with this opinion.
STATEMENT OF THE CASE
On April 22, 2014, the State filed a bill of information charging defendant, Raymond Clay, with possession of a firearm by a convicted felon on or about February 18, 2014, in violation of La. R.S. 14:95.1.[1] Defendant was arraigned on April 30, 2014, and pleaded not guilty. Thereafter, defendant filed a motion to suppress the evidence on May 12, 2014, and, following a hearing on October 27, 2014, that motion was denied. Defendant filed a motion to reconsider the previously denied motion to suppress on April 17, 2017, which motion was also denied.[2] Subsequently, on April 18, 2017, the case was tried before a twelve-person jury, which found defendant guilty as charged to one count of a convicted felon in possession of a firearm. Defendant was sentenced to imprisonment at hard labor for fifteen years without benefit of parole, probation, or suspension of sentence. Defendant now appeals, challenging the trial court's denial of his motion to suppress and the sufficiency of the evidence.
PERTINENT FACTUAL BACKGROUND
At the crux of this case is a February 18, 2014 warrantless search-represented by the State to be a parolee "compliance check"-which resulted in a Louisiana Department of Probation and Parole agent's *668 seizure of a Keltec 32-caliber handgun from inside the pocket of a pair of coveralls located on the front passenger seat of a vehicle owned by defendant, a parolee, that was parked in front of defendant's residence. The brief February 18, 2014 investigation of defendant, which culminated in his arrest on these charges, was initially conducted by Gretna Police Department Detective Alfred Disler and Jefferson Parish Sheriff's Office Agent Pat DiGiovanni, detailed to the U.S. Marshal Gulf Coast Regional Fugitive Task Force. Following their initial investigation, Detective Disler contacted Louisiana Department of Probation and Parole agents, as well as other Gretna Police Department officers, who thereafter assisted in Probation and Parole's compliance check that resulted in the weapon seizure and defendant's arrest.
The Hearing on Defendant's Motion to Suppress the Evidence
At the October 27, 2014 hearing on defendant's motion to suppress the evidence, the State called only one witness, Detective Disler; the parole officers who conducted the "compliance check" and subsequent search of defendant's residence and vehicle did not testify. During the hearing, Detective Disler explained that on February 18, 2014, he was contacted by Agent DiGiovanni, who stated that he had spoken to an informant who told him that a suspect in an "unrelated investigation," identified as Raymond Clay, was involved in an armed robbery in Lafourche Parish. Detective Disler also learned from Agent DiGiovanni that the informant had advised that defendant was selling guns from a residence located behind a Circle K convenience store. According to Detective Disler, he and Agent DiGiovanni then conducted a computer search of Raymond Clay during which they learned that defendant was on parole for a previous 2004 armed robbery conviction. At that point, Detective Disler contacted Agent Justin Edgecombe of the Louisiana Department of Probation and Parole to advise him of the investigation involving defendant.[3] Agent Edgecombe confirmed to Detective Disler that defendant was on parole and provided him with the address defendant had listed with Probation and Parole. According to Detective Disler, he also contacted other members of the Gretna Police Department to assist in the anticipated compliance check of defendant's residence.
After contacting Probation and Parole and the Gretna Police Department, Detective Disler and Agent DiGiovanni briefly surveilled defendant's Gretna residence located at 319 9th Street, Apartment B, during which they observed defendant "interact" with a black Honda Accord parked in front of the apartment. At that point, Detective Disler notified the officers from the Gretna Police Department and the agents from Probation and Parole of his intention to conduct "a compliance check ... at that location." Thereafter, Probation and Parole agents, including J.D. Bertrand, Wayne Griffis, and Justin Edgecombe, arrived at defendant's residence, knocked on the door, and defendant answered. The Probation and Parole agents then conducted a compliance check while Detective Disler and officers from the Gretna Police Department provided security outside the residence. Inside of defendant's kitchen pantry, Probation and Parole agents found marijuana, a one-hit pipe, a drug test kit, and a scale.
Detective Disler testified that during the compliance check, Probation and Parole *669 agents "searched" the black Honda Accord parked outside the apartment and, on the front passenger seat, found a handgun located in the pocket of a pair of coveralls. By then, however, Detective Disler was already inside of the apartment.
On cross-examination, Detective Disler acknowledged that he did not personally speak to the informant, was not the informant's control agent, did not know whether the informant had previously provided information which led to arrests and/or convictions, and did not know whether or not the informant's information was reliable. Detective Disler did not provide the informant's name. He gave no testimony as to what parish the Circle K convenience store where defendant was purportedly selling guns was located, and conceded that the detectives had no information that defendant was selling guns either from his apartment or his vehicle. Detective Disler also did not know which agent from Probation and Parole was defendant's supervising agent, and specifically did not know whether or not Agent Edgecombe was defendant's supervising agent. Detective Disler also testified to his understanding that, as a parolee, defendant consented to searches of his residence and vehicle as a condition of his parole.
At the conclusion of the hearing, the trial judge denied the motion to suppress, stating:
All right, the Court has heard in this Motion to Suppress Evidence from Det. Alfred Distal [sic] of the Gretna Police Department who has indicated he received information from Officer Pat Digiovanni [sic] regarding a Raymond Clay, information that Mr. Clay was involved in the selling of guns. It was learned that Mr. Clay was currently on probation.
The Probation and Parole Department conducted a compliance search at 319 9th Street, Apartment B, in which they discovered marijuana, a pipe, a drug test kit, and a scale. They also determined that a black Honda belonged to Mr. Clay. The Probation and Parole officer searched that Honda and located a gun on the front passenger seat in a pair of blue coveralls.
We also heard that Mr. Clay was involved in some jail phone calls, which the record would indicate, and that his girlfriend, Monique, had told Probation and Parole that the ownership of the vehicle was with Mr. Clay.
Based upon the testimony, the Motion to Suppress Evidence is denied.
Defendant's Motion to Reconsider Motion to Suppress Evidence
Prior to the commencement of trial, defendant filed a motion requesting that the trial court reconsider its denial of his motion to suppress in light of the Fourth Circuit's decision in State v. Julien , 16-1223 (La. App. 4 Cir. 3/15/17), 229 So.3d 640, which he averred held that a compliance check conducted by an agent other than the probationer's assigned agent was a pretext for a warrantless search.[4] Relying *670 on Julien , defendant argued that, because the searches of his residence and vehicle were conducted by Probation and Parole agents who were not actually assigned to him, the seizure of the weapon taken from his vehicle should have been suppressed. In response, the State argued that Julien was distinguishable in that the compliance check in that case was conducted with no reasonable suspicion, whereas, due to the tip provided by the informant to Agent DiGiovanni, the agents conducting the compliance check of defendant's residence had reasonable suspicion to believe defendant had been engaged in criminal activity justifying a search of his residence and vehicle.
Following a hearing, and agreeing with the State that the Julien case was distinguishable, the trial court denied defendant's motion to reconsider stating, in pertinent part:
[I]n this case the officers went into [defendant's] place of residence as a result of information provided to them. The law clearly states that probable cause is not necessary, just a reasonable suspicion. This case does include a reasonable suspicion that is distinguished from the Julien case in which the Fourth Circuit clearly states that this was not-in Julien not based on any type of tip, and, therefore, the district court did, in fact, find that it was simply pretextual.
Thereafter, the matter proceeded to trial before a twelve-person jury.
The Trial
During the April 19, 2017 trial, the State called five witnesses, including Detective Disler, Agent DiGiovanni, and Probation and Parole Agents, Wayne Griffis and J.D. Bertrand, all of whom participated in the February 18, 2014 search of defendant's residence.[5]
Detective Alfred Disler
At trial, Detective Disler expanded upon his prior testimony in several respects. He explained to the jury that before he and Agent DiGiovanni surveilled defendant's Gretna residence:
"We had Probation and Parole, as well as members of the West Bank Major Crimes Task Force, staging at the Gretna Police Department ... notified them that a compliance check would be done at that location."
As to the surveillance, he explained that he and Agent DiGiovanni surveilled defendant's residence in separate, unmarked vehicles. While outside the residence, he observed defendant leave Apartment B at 319 9th Street in Gretna and walk to his vehicle, which was parked in the parking *671 lot approximately 50 yards south of the apartment. He stated that he saw defendant open the door of the Honda, unhook the hood latch and pop the hood, then move to the front of the vehicle, and begin working under the hood. Detective Disler did not see defendant get into the vehicle and did not see defendant in physical possession of the gun. He explained that he conducted a computer check of the black Honda's license plate, which revealed that the car was registered to defendant. He later received certified records from the Department of Motor Vehicles to the same effect, as well as a bill of sale reflecting that defendant had purchased the 2000 Honda Accord on January 8, 2013.
Detective Disler stated that, after assuring themselves that defendant resided at the address and that he was home, Probation and Parole and the Gretna Task Force were contacted to activate the search. According to Detective Disler, he and Agent DiGiovanni did not enter the residence until Probation and Parole and the backup officers had arrived. He explained that Probation and Parole was involved because defendant was on parole. Detective Disler further explained that when Probation and Parole knocked on the apartment door, while he was right there with them, Probation and Parole made the contact. He testified that when defendant answered the door, his girlfriend, Monique Odom, was present. Detective Disler reiterated that he did not conduct the search. He stated that after the parole agent found the marijuana and drug paraphernalia in the kitchen pantry, the agent advised him of the find. At that point, he claimed that he entered the home, viewed the marijuana and paraphernalia in situ , and inquired of defendant to whom it belonged. Defendant responded that the items were his and, at that point, Detective Disler advised defendant of his rights. At the conclusion of the search, Detective Disler collected both the contraband from the kitchen pantry and the gun confiscated from the Honda Accord. When he retrieved the handgun from the pocket of the coveralls, Detective Disler found that it was loaded. Thereafter, he unloaded the weapon.
According to Detective Disler, after defendant was arrested, he was transported to the Jefferson Parish Correctional Center where, at booking, defendant provided that his occupation was a boilermaker.
Detective Disler provided no testimony at trial (or at the suppression hearing) regarding what information, if any, he imparted to the Probation and Parole agents about the informant, i.e. , what information the informant purportedly provided to law enforcement, his reliability, his veracity, etc. There was also no testimony from Detective Disler (at trial or at the suppression hearing) regarding what details, if any, he provided to the Probation and Parole agents regarding the nature of their investigation of defendant, or that defendant was engaging in criminal activity either in his apartment or involving his vehicle.
Agent Pat DiGiovanni
At trial, Agent DiGiovanni testified that Jefferson Parish Sheriff's Office members of the U.S. Marshal's Gulf Coast Task Force, as well as the Gretna Police Department and the Louisiana Probation and Parole Office, were all involved in the investigation of defendant. He explained that on February 18, 2014, he and Detective Disler first conducted criminal history and background checks of defendant and then obtained his photograph for identification purposes. Next, during that morning, they relocated to the Gretna residence where they suspected they would find defendant. While there, they observed defendant exit the apartment, proceed to the black Honda, which was parked near the front of the *672 apartment building, pop the hood, spend a little time under the hood, and then return to the residence. They ran a license plate inquiry that indicated the Honda was registered to Raymond Clay.
Agent DiGiovanni testified that, at that point, Detective Disler contacted the Gretna Police Department and the Louisiana Probation and Parole Office since defendant was on parole for armed robbery. He explained that he and Detective Disler did not enter the residence or the vehicle because neither of them worked for Probation or Parole. According to Agent DiGiovanni, once Probation and Parole agents and members of the Gretna Police Department arrived, everyone walked to the residence. Thereafter, someone from Probation and Parole knocked on the door. At that point, Agent DiGiovanni explained that he was a couple of people back in line.
Agent DiGiovanni testified that during the search, he was assigned to watch Raymond Clay and his girlfriend in the living room while Probation and Parole searched the apartment and vehicle. While he did not personally see anything in either the apartment or the car, he confirmed that there was marijuana in the pantry and a gun in the car.
Agent DiGiovanni provided no testimony whatsoever-either in or out of the jury's presence-about the informant. Specifically, he did not identify the informant, testify as to the informant's reliability, nor as to whether the informant had previously provided information which had resulted in an arrest or conviction. Agent DiGiovanni did not testify concerning the informant's statements to him that defendant was involved in a Lafourche Parish armed robbery or that he was selling guns from a residence located behind a Circle K convenience store. Agent DiGiovanni also provided no testimony relative to the specific parish in which the Circle K was located or as to whether the informant had advised that defendant was selling guns from the Gretna apartment or from the black Honda Accord.
Agent Wayne Griffis
Probation and Parole Agent Wayne Griffis testified that he participated in the events of February 18, 2014. He stated that, as a Probation and Parole agent, his duties and responsibilities are primarily to monitor the actions of the parolee in order to make sure that he is in compliance with the rules and regulations of his parole. He explained that parolees are required to inform the Probation and Parole Department of where they reside. Parolees are also subject to compliance checks of their residences, the purpose of which is to make sure that the parolee is in compliance with the rules and regulations of parole.
Agent Griffis testified that also involved with him in the events occurring on February 18, 2014, were Probation and Parole Agents Pollman, Bertrand, Edgecombe, as well as Detective Disler, Agent DiGiovanni, and other members of the Gretna Police Department and, he thought, Jefferson Parish Sheriff's Office. Agent Griffis explained that he was not defendant's supervising probation and parole agent, but rather, Agent Nathan Gordon was defendant's direct supervisor. Agent Griffis stated that Agent Gordon was not involved in the events of February 18, 2014.
Agent Griffis testified that he did not participate in surveilling defendant's residence. He explained that while the apartment was under surveillance, he and the other officers and agents were gathered at another location being briefed. After approximately fifteen minutes of briefing, he and the others departed at the same time and proceeded to defendant's residence. Those gathered for the briefing included members from the Louisiana Probation *673 and Parole Office, Gretna Police Department and, he believed, someone from the Jefferson Parish Sheriff's Office. Upon arrival at defendant's residence, Agent Griffis and the other Probation and Parole agents knocked on the door. Agent Griffis testified that he understood, because he and his fellow agents were from Probation and Parole, that they were the ones who were supposed to go up to the door while the other officers provided perimeter security. According to Agent Griffis, when defendant (or someone) answered the door, he and the others entered the residence, advised defendant that they were there to conduct a compliance check, and then seated defendant and his girlfriend in the living room. The Probation and Parole agents first conducted a safety sweep of the house to make sure that no one else was present that could hurt them. At that point, Agent Pollman, who was the agent in charge of the Probation and Parole agents present, directed Agent Griffis to check the kitchen area, which he did. When he looked inside of the pantry, Agent Griffis discovered a Ziploc bag containing what he thought was marijuana. He then looked further and found a scale, a blue pipe, and a drug test kit. He stated that he left everything in place and alerted Detective Disler of his discovery. Detective Disler took possession of the items. Defendant thereafter admitted that the marijuana was his.
Agent Griffis did not testify at trial about the informant, the nature of the investigation, and what, if anything, he knew about defendant's alleged criminal activity occurring either at the Gretna apartment or in the Honda Accord. Agent Griffis also did not testify that any evidence of criminal activity was observed, or that any evidence was discovered in plain view, while Probation and Parole agents conducted a safety sweep of defendant's residence.
Agent J.D. Bertrand
Probation and Parole Agent J.D. Bertrand also testified at trial. He explained that on February 18, 2014, the Gretna Police Department notified the Louisiana Department of Probation and Parole Office that defendant was under investigation. He testified that, "[a]t the time we elected-under Article 15:574, the conditions of parole, we elected to do a residence check at Mr. Clay's address of record." Agent Bertrand explained that every parolee signs a form stating that, while under supervision, the parolee is subject to random checks at his or her residence which includes, if there is reasonable suspicion that the parolee is involved in criminal activity, a search of the residence without a warrant.
Agent Bertrand testified that upon receiving the call from the Gretna Police Department, he and the other Probation and Parole agents, along with several officers from the Gretna Police Department, met at the Department for a briefing. Thereafter, they relocated to the defendant's residence, approximately five minutes away. While Agent Bertrand testified that he believed Detective Disler attended the briefing, Detective Disler testified that, in fact, he was not present, but rather, was with Agent DiGiovanni surveilling defendant's residence during that time. When asked whether he and the other agents, while at the briefing, had devised a plan regarding how they were going to proceed to defendant's residence, Agent Bertrand responded, "Well, it's standard operating procedure," but also stated the discussion at the briefing was limited to developing a plan of action for actually going into the residence, and how they were going to conduct the compliance check. While the various agents and officers were being briefed, the probation and parole agents were not in radio communication with the surveilling officers and, thus, had no information *674 regarding defendant having exited the residence to access the Honda Accord until after they arrived at the apartment complex.
Agent Bertrand explained that upon entering defendant's apartment, he and the other probation and parole agents conducted a protective sweep in order to make sure that only defendant and his wife were home. After completing the protective sweep, and even though defendant's residence in the apartment had already been verified, the officers commenced the "compliance check." According to Agent Bertrand, his role, based upon the information they had, was to conduct a check of defendant's vehicle. He testified that, upon reaching the car, he found that it was unlocked. He opened the passenger-side door and then leaned in to see if there was anything within the vehicle observable in plain view. Agent Bertrand stated that when he leaned in, he rested his hand on top of a pair of coveralls located on the front passenger seat. As he did so, he felt what he believed to be a firearm located in the pocket of the coveralls. According to Agent Bertrand, though he could not, and did not, see the gun before he touched it, as his hand landed, he believed what he was feeling was the shape of a firearm. At that point, he opened the coverall pocket and saw the gun. After discovering the weapon, Agent Bertrand asked another officer to inform Detective Disler of the gun while he remained with the vehicle. He personally observed Detective Disler retrieve the gun and unload it.
Agent Bertrand provided no trial testimony regarding the informant; what, if anything, he was told by law enforcement regarding the nature of the investigation involving defendant; or, that he had been advised that criminal activity was occurring at defendant's residence or in his vehicle.
In short, there was no testimony presented by the State at trial that any of the Probation and Parole agents had any knowledge about an informant, the substance of the informant's information, his reliability, or whether the informant had previously provided information which resulted in an arrest or conviction. There was also no testimony adduced that any Probation and Parole agent had any knowledge of defendant's alleged Lafourche Parish armed robbery or of his purported gun sales. There was also no testimony by the Probation and Parole agents that they had observed any evidence of criminal activity or discovered any contraband in plain view during their protective sweep of defendant's residence. The Probation and Parole agents testified only that they were notified by the Gretna Police Department that defendant was under investigation, that they went to the Gretna Police Department where they discussed with various officers how they would handle the compliance check, and that 15 minutes later, they relocated to defendant's residence and conducted a "compliance check."
ISSUES PRESENTED FOR APPELLATE REVIEW
On appeal, defendant challenges the trial court's denial of his motion to suppress and the sufficiency of the evidence. Generally, under State v. Hearold , 603 So.2d 731, 734 (La. 1992), the appellate court addresses the sufficiency claim first. However, in the instant case, because our determination that the trial court erred in denying the motion to suppress requires a reversal of defendant's conviction and a remand of the case, we first address defendant's assignment of error concerning the motion to suppress. Consequently, we do not reach the issue of whether the evidence was *675 sufficient to support defendant's conviction.
APPLICABLE LAW
The Fourth Amendment to the United States Constitution and Article I, § 5 of the Louisiana Constitution protect individuals against unreasonable searches and seizures. U.S. Const. Amend. IV ; La. Const. Art. 1, § 5. If evidence is derived from an unreasonable search or seizure, the proper remedy is to exclude the evidence from trial. State v. Bardell , 17-274 (La. App. 5 Cir. 11/15/17), 232 So.3d 82, 86 ; State v. Burton , 11-1023 (La. App. 5 Cir. 5/22/12), 98 So.3d 375, 379, writ denied , 12-1422 (La. 1/11/13), 106 So.3d 547. Warrantless searches and seizures are unreasonable per se unless justified by a specific exception to the warrant requirement. State v. Marks , 09-260 (La. App. 5 Cir. 10/27/09), 28 So.3d 342, 350, writ denied , 09-2568 (La. 5/7/10), 34 So.3d 860 ; State v. Manson , 01-159 (La. App. 5 Cir. 6/27/01), 791 So.2d 749, 757, writ denied , 01-2269 (La. 9/20/02), 825 So.2d 1156. In a hearing on a motion to suppress, when the constitutionality of a warrantless search or seizure is placed at issue, the burden is on the State to demonstrate the admissibility of evidence seized without a warrant. La. C.Cr.P. art. 703(D) ; State v. Parnell , 07-37 (La. App. 5 Cir. 5/15/07), 960 So.2d 1091, 1097, writ denied , 07-1417 (La. 1/7/08), 973 So.2d 733. The trial court's denial of a motion to suppress is afforded great weight, and it will not be set aside unless the preponderance of the evidence clearly favors suppression. State v. Lewis , 12-902 (La. App. 5 Cir. 6/27/13), 121 So.3d 128, 134, writ denied , 13-1926 (La. 4/17/14), 138 So.3d 618.
This Court has recognized that "[a]n individual on parole or probation does not have the same freedom from governmental intrusion into his affairs as does the average citizen." State v. Saulsby , 04-880 (La. App. 5 Cir. 12/28/04), 892 So.2d 655, 657-58. The reduced expectation of privacy derives from the parolee's conviction and his agreement to allow a probation officer to investigate his activities in order to confirm that he is abiding by the provisions of his parole. Id. Simply put, a parolee's freedom is conditioned by restrictions pursuant to the provisions of his parole. State v. Young , 07-988 (La. App. 5 Cir. 6/19/08), 988 So.2d 759, 763, writ denied , 08-1559 (La. 3/27/09), 5 So.3d 139.
Though a parolee's freedom is diminished, a parolee is not subject to the unrestrained power of the authorities, and a parole officer may not use his authority as a subterfuge to help another police agency that desires to conduct a search, but lacks probable cause. Marks , 28 So.3d at 351, citing State v. Malone , 403 So.2d 1234, 1238 (La. 1981). The parole officer must believe the search is necessary in the performance of his duties and is reasonable in light of the totality of the circumstances. Saulsby , 892 So.2d at 658. In determining whether a warrantless search by a parole officer was reasonable, the court must consider: (1) the scope of the particular intrusion; (2) the manner in which it was conducted; (3) the justification for initiating it; and (4) the place in which it was conducted. Malone , 403 So.2d at 1239 ; Marks , 28 So.3d at 351 ; Young , 988 So.2d at 763-64. Although the State still bears the burden of proof when a search is conducted without a warrant, when the search is conducted for probation or parole violations, the State's burden will be met when it establishes that there was reasonable suspicion that criminal activity was occurring. State v. Jones , 12-0438 (La. App. 4 Cir. 3/13/13), 119 So.3d 9, 16, writ denied , 13-1199 (La. 1/17/14), 130 So.3d 340.
*676 "Reasonable suspicion" is something less than probable cause and is determined under the facts and circumstances of each case by whether the officer had sufficient facts within his knowledge to justify an infringement on the individual's right to be free from governmental interference. State v. Tovar , 03-513 (La. App. 5 Cir. 10/15/03), 860 So.2d 51, 54. Under certain circumstances, an informant's tip can provide "reasonable suspicion." Id. Generally, there must be some corroboration of the informant's tip and the tip must contain predictive information regarding the future behavior of the reported suspect. Alabama v. White , 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) ; State v. Robertson , 97-2960 (La. 10/20/98), 721 So.2d 1268, 1270. The United States Supreme Court has applied a "totality of the circumstance approach," which considers an informant's veracity, reliability and basis of knowledge as highly relevant in determining the value of an informant's tip. Illinois v. Gates , 462 U.S. 213, 214, 103 S.Ct. 2317, 2320, 76 L.Ed.2d 527 (1983) ; State v. Nelson , 02-65 (La. App. 5 Cir. 6/26/02), 822 So.2d 796, 801, writ denied , 02-2090 (La. 2/21/03), 837 So.2d 627. "If a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." Alabama v. White , 496 U.S. at 330, 110 S.Ct. at 2416 ; Tovar , 860 So.2d at 55.
DISCUSSION
In support of his argument that the trial court erred in denying his motion to suppress evidence, defendant contends that, considering the testimony of the witnesses presented by the State, both at the hearing and at trial, the search of his residence and vehicle conducted by agents from Probation and Parole-who were not assigned to him, and who were accompanied by law enforcement officers from various state agencies-was not based on reasonable suspicion. According to defendant, even if the Probation and Parole agents were legally permitted to randomly conduct a compliance check without needing reasonable suspicion, there was no justification to expand the "invasion" to a full search of his residence and vehicle. Specifically, defendant contends that, prior to the search, when Detectives Disler and DiGiovanni were surveilling his residence, their testimony confirms that no criminal activity was observed. And thereafter, during the compliance check of his residence, Agents Griffis and Bertrand did not observe any evidence in plain view that would have given rise to a reasonable suspicion that defendant was engaged in criminal activity or that would justify the subsequent search into his kitchen pantry and/or his vehicle.
According to defendant, the sole impetus for the warrantless search was the "tip" Detective DiGiovanni received from an unidentified informant concerning a suspect, whom the informant identified as defendant, that was involved in an armed robbery in Lafourche Parish. Relying on Saulsby , supra , defendant avers that the State failed to sufficiently prove the reliability of the informant.[6] He argues that, as in Saulsby , there were insufficient facts *677 established by the State at the suppression hearing or at trial to determine the reliability of the informant, and insufficient corroboration from the investigation by police and parole agents to substantiate the informant's vague allegations. In short, defendant claims that the "compliance check" of his residence and vehicle was merely a "subterfuge" for a police investigation lacking probable cause. Consequently, defendant contends the trial court erred in failing to suppress all evidence seized during the February 18, 2014 warrantless search.
In contrast, the State contends that the search of defendant's residence was performed by "[defendant's] parole officer while [defendant] was on parole."[7] According to the State, as a condition of his parole (which conditions are governed by La. R.S. 15:574.4 ), defendant agreed to warrantless searches of his person, property, residence, and vehicle by his parole officer when the officer has reasonable suspicion to believe that the parolee is engaged in criminal conduct.[8]
The State further claims neither Jefferson Parish Sheriff's deputies nor Gretna *678 Police officers illegally searched defendant's residence, but rather, based on the *679 information received from the informant that defendant was possibly selling guns behind a Circle K convenience store, coupled with the discovery that defendant was on parole for armed robbery, Detective Disler contacted the Louisiana Department of Probation and Parole and their agents conducted "a routine check" of defendant's residence and a "sweep of the residence" for officers' safety. According to the State, it was during the protective sweep (not the compliance check) that Agent Griffis discovered the marijuana and drug paraphernalia, ownership of which defendant later acknowledged. The State argues that Probation and Parole only conducted a sweep of defendant's residence so that they could then safely conduct a compliance check and, although they did not need reasonable suspicion to do so, "they [i.e. , Probation and Parole] had reasonable suspicion based upon the information given by the informant." [Emphasis supplied.] Moreover, the State argues that due to the discovery of the contraband during their sweep of the residence, at that point, the Probation and Parole agents "clearly had reasonable suspicion to believe [defendant] was engaged in criminal conduct," and "they had no impediment to search [d]efendant's car." As such, the State maintains that the trial judge did not err by denying defendant's motion to suppress.
Keeping in mind that a trial court's decision to deny a motion to suppress is afforded great weight and will not be set aside unless the preponderance of the evidence clearly favors suppression, in the instant case, the admissibility of the evidence seized hinges on whether the record supports a finding that the agents from Probation and Parole-not the officers from the Gretna Police or the Jefferson Parish Sheriff's Office-had "reasonable suspicion" to believe that defendant was engaged in criminal activity sufficient to justify their warrantless search of his residence and vehicle. See Lewis , 121 So.3d at 134 ; State v. Clement , 11-1150 (La. App. 5 Cir. 9/11/12), 101 So.3d 460, 469, writ denied , 12-2214 (La. 4/1/13), 110 So.3d 139. Based upon our review of the record, and after applying the aforementioned four Malone factors to the facts presented, we are convinced that it does not. See Malone , 403 So.2d at 1239 ; Marks , 28 So.3d at 351 ; Young , 988 So.2d at 763-64.
In particular, we find that the manner in which the search of defendant's residence and vehicle was conducted, the scope of the search, and the justification for initiating the search, require that the trial court's ruling denying defendant's motion to suppress the evidence be reversed and that his conviction and sentence be vacated.
Manner of the Search
As previously stated, a parole officer may not use his authority as a subterfuge to help another police agency that desires to conduct a search, but lacks the necessary probable cause. State v. Bolden , 09-33 (La. App. 5 Cir. 5/12/09), 13 So.3d 1168, 1171, writ denied , 09-1317 (La. 2/5/10), 27 So.3d 297 ; Saulsby , 892 So.2d at 658. The record herein suggests that this is exactly what happened in the instant case. According to the testimony of Agents Griffis and Bertrand, the "compliance check" of defendant's residence was not part of a regularly scheduled (or even a random) check, nor was it instigated by the parole officer regularly assigned to defendant. The record contains no evidence suggesting that defendant had previously been in violation of his parole. Additionally, the testimony of Detective Disler and Agent DiGiovanni, the officers who conducted the surveillance of defendant's residence prior to the search, confirmed that they did not observe *680 any illegal activity occurring at his residence or involving his vehicle.
Despite the fact that no criminal activity was observed during surveillance, officers from the Gretna Police Department and Jefferson Parish Sheriff's Office converged on defendant's residence from a nearby staging area. Based on the record testimony, it is clear that the officers convened solely because of the unsubstantiated "tip" received from the informant-whose reliability was never established-that defendant was involved in an unrelated criminal investigation.[9] The State's evidence failed to show that the agents from Probation and Parole were ever made aware of the informant or advised as to the nature of the investigation that purportedly involved defendant. Nonetheless, based solely upon a statement received from Detective Disler that defendant was "under investigation," Probation and Parole "elected" to conduct a compliance check of defendant's residence. The record testimony, however, suggests that the decision to conduct the "compliance check" was actually instigated by Detective Disler of the Gretna Police Department and not by Probation and Parole.
In short, reviewing the totality of the circumstances, we find a complete lack of evidence to prove that Probation and Parole had reasonable suspicion that criminal activity was occurring prior to participating in the compliance check and subsequent warrantless search of defendant's residence and vehicle. As the Louisiana Supreme Court observed in Julien , supra , the very presence of officers from multiple law enforcement agencies "belies any suggestion that the officers did not intend to conduct a search" of defendant's residence, but were there merely to conduct a standard compliance check. Julien , 234 So.3d at 25. In fact, a review of the record testimony in the instant case suggests that the officers and agents involved all understood that they were converging upon defendant's residence not to conduct a "routine compliance check" as the State posits, but rather, were assembling at the police station and thereafter going to defendant's residence with the specific intent to conduct a "search" of both his residence and his vehicle.
Our review of the record convinces us that the actions of the Probation and Parole agents went far beyond a routine compliance check to confirm that defendant was residing at the residence, which is "normally conducted by the probation department." Julien , supra . In particular, the visit did not end when the agents *681 located defendant in his residence. Despite the agents' testimony that no contraband was observed in plain view during their protective sweep of the residence for safety, and there was no indication whatsoever that criminal activity was occurring, the agents nevertheless confined defendant to the living room area. And, while he was detained by police officers, despite the lack of reasonable suspicion, the agents proceeded to conduct a "search" of the kitchen area, including the pantry, and defendant's vehicle. Accordingly, we find that Probation and Parole exceeded their authority in their search of defendant's residence and vehicle; the manner in which the search was conducted smacked of subterfuge for a police investigation lacking probable cause.
Scope of the Search
The scope of the search was also unreasonable. According to the record testimony, when the probation and parole agents arrived at defendant's apartment and knocked on the door, he voluntarily let them inside. Once the agents confirmed that defendant was actually residing at the residence, and there being no evidence or suggestion that the agents observed any contraband in plain view or detected any signs of illegal activity when conducting their protective sweep of the premises, had this actually been a routine compliance check, it would have concluded here. Instead, Agent Griffis testified that, while defendant was confined to the living room area, he was "assigned to check the kitchen area" and, in conducting a search of the kitchen's pantry, he found marijuana. Agent Griffis stated that when he searched "a little bit further," he discovered additional drug paraphernalia. It is undisputed that the marijuana and drug paraphernalia found by Agent Griffis during his "check" were not discovered in plain view.
While we agree that is an appropriate function of the parole officer to conduct unannounced checks in order to confirm a parolee's compliance with the provisions of his parole, and that a parolee has a reduced expectation of privacy which allows intrusions of his residence, a parole officer's powers are not unfettered. See Marks , 28 So.3d at 351 ; Malone , 403 So.2d at 1238. Based on the complete lack of evidence in the record to support a finding that a reasonable suspicion of criminal activity existed that would justify expanding the scope of the compliance check to include Agent Griffis' search of the pantry in defendant's kitchen, we find that Agent Griffis exceeded his authority and that such a search was unconstitutional. See Julien , 234 So.3d at 26.
Similarly, according to the testimony of Agent Bertrand, once a protective sweep of the residence was conducted (during which no contraband was discovered in plain view) and the agents made sure that only defendant and his girlfriend were in the home, "the residence check was started."[10] He testified that his "role ... based on the information [they] had, was to go out and check defendant's car." However, according to the record testimony, the only information Probation and Parole actually "had" about defendant was that he was being investigated by the Gretna Police Department. The record contains no testimony indicating that Probation and Parole was advised either about the existence of an informant or that defendant was believed to be selling guns, much less that he might be storing guns in his vehicle. Moreover, during the brief surveillance conducted by Detectives Disler and DiGiovanni *682 prior to the "compliance check," while they had observed defendant accessing his vehicle in order to pop its hood, and saw him briefly working underneath the vehicle's hood, there is no testimony suggesting that the officers observed defendant inside the vehicle or observed any illegal activity occurring in relation to the vehicle. Additionally, when Agent Bertrand searched the vehicle, the gun found inside was not discovered in plain view; it was found inside an open pocket of coveralls laying on the front seat. Considering the totality of the circumstances, even if, as the State suggests, reasonable suspicion was not required in order for Probation and Parole to conduct a "routine compliance check," we find that no reasonable suspicion existed for Agents Griffis and Bertrand to expand their "compliance check" into a full-blown search of defendant's residence, nor to extend the scope of the search to defendant's vehicle.
Justification for the Search
Based on the information Agent DiGiovanni received from the confidential informant that defendant was possibly selling guns, coupled with the confirmation from Probation and Parole that he was on parole while doing so, the trial court determined that a reasonable suspicion existed justifying the warrantless search. We disagree.
Because no warrant based on probable cause of criminal activity was obtained prior to the search of defendant's residence and/or his vehicle, the search was per se unreasonable absent a valid exception to the warrant requirement. Marks , 28 So.3d at 350 ; Manson , 791 So.2d at 757. The State bore the burden to demonstrate the admissibility of the evidence seized without a warrant. La. C.Cr.P. art. 703(D) ; Parnell , 960 So.2d at 1097.
The State argues that the "compliance check" and concomitant search of defendant's residence and vehicle were justified because there was "reasonable suspicion" to believe that defendant had committed an armed robbery in a neighboring parish and that he was selling guns. However, when specifically asked whether there was any information suggesting that defendant would be in possession of or selling guns from his residence or vehicle, the State's witnesses stated there was none. Thus, the sole basis for the alleged "reasonable suspicion" upon which law enforcement relied to justify the search of defendant's residence and vehicle arose out of the "tip" Detective DiGiovanni received from the unidentified informant. However, without even addressing the reliability, veracity, and basis of the informant's alleged knowledge about defendant-which were never established at trial-whether the officers from Gretna Police and the Jefferson Parish Sheriff's Office had reasonable suspicion based on the informant's tip is irrelevant. Obviously, the information derived from the informant's tip was insufficient to establish the necessary probable cause the officers needed in order to obtain a search warrant. Instead, the State's burden was to prove that the informant's tip-which is the only information law enforcement officers had suggesting that defendant was involved in illegal activity-provided the Probation and Parole agents with the requisite reasonable suspicion in order for them to conduct the warrantless search of defendant's residence and vehicle. This the State did not do.
There's been absolutely no showing that anyone from Probation and Parole was even aware that an informant was involved. The sum total of the State's proof was that Probation and Parole confirmed defendant was actively on parole, and that Probation and Parole had been advised that defendant was under investigation. Nothing else. There is no testimony establishing *683 that Detective Disler or Agent DiGiovanni disclosed to Probation and Parole any of the information received from the informant, or even that there was an informant, or about the nature of their purported investigation of defendant. Further, the pre-search surveillance that the officers conducted did not corroborate any of the information provided to Agent DiGiovanni by the informant. There is a complete lack of evidence in the record establishing that the agents from Probation and Parole possessed sufficient-or any-reasonable suspicion that criminal activity was occurring that would justify their warrantless search of defendant's residence and vehicle.
CONCLUSION
For the foregoing reasons, we find the State failed to carry its burden of proving that the Louisiana Department of Probation and Parole possessed sufficient reasonable suspicion to justify the warrantless search of defendant's residence and vehicle. Consequently, the search constituted an unreasonable search and invasion of defendant's privacy under Amendment IV of the United States Constitution and Article I, § 5 of the Louisiana Constitution. Because the search was unconstitutional, we find the trial court erred in denying defendant's motion to suppress the evidence. Accordingly, we reverse the trial court's ruling denying defendant's motion to suppress the evidence, vacate Mr. Clay's conviction and sentence, and remand the matter to the trial court for further proceedings consistent with this opinion.
JUDGMENT ON MOTION TO SUPPRESS THE EVIDENCE REVERSED; CONVICTION AND SENTENCE VACATED; REMANDED.

The State alleged that, in case number 04-1819, defendant was previously convicted of armed robbery in violation of La. R.S. 14:64 on August 18, 2004 in the 24th Judicial District Court in Jefferson Parish.

The record reflects that on May 14, 2014, defendant filed a motion to quash the bill of information and to declare La. R.S. 14:95.1 unconstitutional. It does not appear that this motion was ruled upon. Nevertheless, a defendant waives all pending motions by permitting trial to proceed without raising the issue that his pretrial motions were neither heard nor ruled upon. State v. Alexander , 97-1199 (La. App. 5 Cir. 9/29/98), 720 So.2d 82, 86, writ denied , 98-3109 (La. 4/9/99), 740 So.2d 628.

Detective Disler did not testify at the hearing that he advised Agent Edgecombe regarding either the nature of the investigation, what information had been obtained from the informant, or that they had any discussion concerning the informant's reliability.

At the time the trial court considered defendant's motion to reconsider, State v. Julien , and another Fourth Circuit case, State v. Brignac , 16-1160 (La. App. 4 Cir. 1/18/17), 229 So.3d 525, were pending on writs to the Louisiana Supreme Court. See Julien , 17-0557 (La. 5/12/17), 219 So.3d 1107 ; Brignac , 17-0448 (La. 5/12/17), 219 So.3d 1107. In Julien , the trial court granted the defendant's motion to suppress evidence seized during a warrantless search finding that the agents from Probation and Parole conducting the search lacked authority to do so under La. C.Cr.P. art. 895(A)(13)(a), as the agents were not the defendant's regularly assigned agents as required by the article. The Fourth Circuit denied the State's supervisory writ application on the basis that the officers used the defendant's status as a probationer and the compliance check as a pretext for a warrantless search of his residence, invalidating the search and the seizure of weapons. Julien , 229 So.3d at 647. In Brignac , the Fourth Circuit upheld the warrantless search of a probationer's residence, conducted by an officer other than the one assigned to the defendant, on the basis the search was supported by a reasonable suspicion that defendant was engaged in criminal activity due to a tip agents from Probation and Parole received prior to conducting the residence check that the defendant was engaged in the sale of illegal narcotics. Brignac , 229 So.3d at 529. The Supreme Court consolidated Julien and Brignac for argument, and then issued separate opinions contemporaneously. See State v. Julien , 17-0557 (La. 10/18/17), 234 So.3d 21 and State v. Brignac , 17-0448 (La. 10/18/17), 234 So.3d 46.

In determining whether the trial court's ruling on a motion to suppress is correct, an appellate court is not limited to the evidence presented at the motion to suppress hearing, but also may consider pertinent evidence presented at the trial of the case. State v. Mollette , 08-138 (La. App. 5 Cir. 11/25/08), 2 So.3d 461, 467, writ denied , 09-155 (La. 10/16/09), 19 So.3d 472.

In Saulsby , the defendant, a probationer, pled guilty to possession of cocaine reserving his right, under State v. Crosby , to appeal the trial court's denial of his motion to suppress evidence. At the suppression hearing, a probation officer not assigned to the defendant testified that based on information received from the sheriff's office that the defendant was involved in illegal narcotics activity, he, accompanied by a supervisor and a sheriff's deputy, set up surveillance of the defendant's residence. Though they observed no illegal activity, immediately upon the defendant's arrival, the officers "took him down" and commenced a search of his person and residence discovering a large amount of cash in the defendant's pocket and cocaine hidden in a closet. Without giving any reasons, the trial judge denied the defendant's motion to suppress. On appeal, we reversed the trial court's ruling finding that the warrantless searches of the defendant's person and residence were conducted without reasonable suspicion (i.e. , something more than a mere hunch is required), and were merely a subterfuge for a police investigation lacking in probable cause. Saulsby , 892 So.2d at 657-58.

The trial testimony, however, contradicts the State's contention as Agent Griffis testified specifically that Agent Nathan Gordon, who was not present during the compliance check and warrantless search of defendant's residence, was defendant's assigned parole officer.

La. R.S. 15:574.4.2 provides, in pertinent part:
A. (1) The committee on parole may make rules for the conduct of persons heretofore or hereafter granted parole. When a prisoner is released on parole, the committee shall require as a condition of his parole that he refrain from engaging in criminal conduct.
(2) The committee may also require, either at the time of his release on parole or at any time while he remains on parole, that he conform to any of the following conditions of parole which are deemed appropriate to the circumstances of the particular case:
* * *
(i) Agree to visits at residence or place of employment by the probation and parole officer at any time. Further agrees to searches of person, property, residence, or vehicle, when reasonable suspicion exists that criminal activity has been engaged in while on parole.
La. R.S. 15:574.4.2 does not reference the assignment of the parole agents involved in the search and, arguably, does not require that a compliance check of the parolee's person, property, residence, or vehicle, or that a search based on reasonable suspicion, be conducted by the parole agent regularly assigned to the parolee.
On August 18, 2004, the date of defendant's prior conviction for armed robbery (for which he was on active parole when the February 18, 2014 "compliance check" and subsequent search of his residence was conducted in the instant case), the applicable statute governing the conditions of parole was La. R.S. 15:574.4(H)(4)(r), which provided, in pertinent part:
H. (1) The Board of Parole may make rules for the conduct of persons heretofore or hereafter granted parole. When a prisoner is released on parole, the board shall require as a condition of his parole that he refrain from engaging in criminal conduct.
* * *
(4) The board may also require, either at the time of his release on parole or at any time while he remains on parole, that he conform to any of the following conditions of parole which are appropriate to the circumstances of the particular case:
* * *
(m) Will be subject to visits by his parole officer at his home or place of employment without prior notice.
* * *
(r) Agree to searches of his person, his property, his place of residence, his vehicle, or his personal effects, or any or all of them, at any time, by the probation officer or the parole officer assigned to him , with or without a warrant of arrest or with or without a search warrant, when the probation officer or the parole officer has reasonable suspicion to believe that the person who is on parole is engaged in or has been engaged in criminal activity since his release on parole. [Emphasis supplied.]
La. R.S. 15:574.4 (2004).
In Acts 2012, No. 241, § 1, effective August 1, 2012, the Legislature amended and reenacted La. R.S. 15:574.4.2(A)(2), at which time it eliminated the restriction that the visit to a parolee's residence or workplace and/or the search of his or her person, property, residence, or vehicle be conducted by the Probation or Parole officer "regularly assigned" to the parolee. Consequently, from the date of defendant's conviction herein in 2004 through July 31, 2012, the applicable statute required that visits and/or searches of a parolee be conducted by the Probation or Parole officer regularly assigned to the parolee. However, from August 1, 2012 through the present, the statute, as amended and reenacted, arguably allows that such visits and/or searches be conducted by a Probation or Parole officer other than the officer regularly assigned to the parolee.
Inmates are paroled under the conditions authorized by the statute at the time of parole , not at the time of conviction. State v. Sorrell , 95-136 (La. App. 5 Cir. 5/10/95), 656 So.2d 1045, 1048, writ denied , 95-1268 (La. 6/30/95), 657 So.2d 1035. Defendant's prior conviction for armed robbery occurred on August 18, 2004; the record before us does not reflect the date upon which defendant was released on parole. In the instant matter, defendant committed the charged offense on February 18, 2014. If paroled on the prior 2004 offense on or before July 31, 2012, the conditions of defendant's parole would be governed by La. R.S. 15:574.4(H)(4)(r) (as referenced by the State in its brief on appeal). If so, the compliance check of defendant's residence conducted by Agents Bertrand and Griffis-who, according to their testimony at trial were not his regularly assigned parole officers; it was Agent Nathan Gordon-was a clear violation of the statute, and a reversal of the trial court's ruling denying the motion to suppress the evidence seized would be required on that basis alone. See State v. Julien , 17-0557 (La. 10/18/17), 234 So.3d 21 and State v. Brignac , 17-0448 (La. 10/18/17), 234 So.3d 46 (wherein the Supreme Court held that La. C.Cr.P. art. 895(A)(13)(a), which governs warrantless searches of a probationer's person, property, and residence, but tracks exactly the language contained in La. R.S. 15:574.4 prior to the effective date of its amendment in 2012, mandates that a compliance check be conducted by the probationer's regularly assigned probation officer). Consequently, no further inquiry as to whether "reasonable suspicion" existed to conduct the ensuing search of defendant's residence would be required. If, however, defendant was paroled on or after August 1, 2012, though Agents Bertrand and Griffis arguably had authority under La. R.S. 15:547.4.2(A)(2)(i) to conduct the compliance check of defendant's residence, an inquiry into whether the record supports the trial court's finding that the agents had "reasonable suspicion" to believe defendant had been engaged in criminal activity sufficient to justify the warrantless search of his residence and vehicle is still required.
Despite the fact that the record on appeal does not reflect defendant's date of parole on his prior conviction, because our review of the record and the totality of the circumstances convinces us that the State failed to prove that a reasonable suspicion existed sufficient to justify the warrantless search of defendant's residence or vehicle, thus mandating a reversal of the trial court's denial of defendant's motion to suppress evidence, rather than remand the matter to the trial court solely to ascertain his date of parole, we pretermit consideration as to which version of La. R.S. 15:547.4 applies to the compliance check in this case, and as to whether the Probation and Parole agents who conducted the compliance check were legally authorized to do so. Regardless of which version of La. R.S. 15:547.4 applies, the record shows that the Probation and Parole agents who conducted the February 18, 2014 compliance check lacked sufficient reasonable suspicion that criminal activity was occurring to justify the warrantless search of defendant's residence and vehicle.

The record is devoid of any information regarding the reliability of the informant who provided Agent DiGiovanni with the information regarding defendant. There is no testimony that Detective DiGiovanni knew the informant, knew anything about the informant, or whether the informant even knew defendant. Similarly, there is no testimony suggesting that the informant provided any physical description of defendant, where exactly the "residence behind the Circle K" from which he was reportedly selling guns was located, or what kind of vehicle he drove. No testimony was provided establishing a factual basis as to how the informant obtained the incriminating information about defendant, or the circumstances in which the informant came to convey that information to Agent DiGiovanni. In fact, the State asked Agent DiGiovanni, who testified at trial, no questions regarding the informant. The only information about the informant was provided by Detective Disler, who conceded that he never personally spoke to the informant, he had no knowledge as to the reliability of the informant, nor did he have knowledge as to whether the informant had previously provided information which led to any arrests and/or convictions. Moreover, Detective Disler stated that there was no information from the informant to the effect that defendant would be in possession of or selling guns from his Gretna apartment or vehicle.

Agent Bertrand's testimony contradicts the State's contention that the contraband was discovered during the protective sweep.