STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2019 KA 0034

STATE OF LOUISIANA

VERSUS

RONALD ST. CYRE

Judgment Rendered: **DEC 1 9 2019**

* * * * *

On Appeal from the
22nd Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
Trial Court No. 598,521

Honorable Scott Gardner, Judge Presiding

* * * * *

Samuel H. Winston
New Orleans, LA
James E. Boren
Baton Rouge, LA

Attorneys for Defendant-Appellant,
Ronald St. Cyre


Warren L. Montgomery
District Attorney
Matthew Caplan
Assistant District Attorney
Covington, LA

Attorneys for Appellee,
State of Louisiana


* * * * *

BEFORE: HIGGINBOTHAM, PENZATO AND LANIER, JJ.

**HIGGINBOTHAM, J.**

The defendant, Ronald St. Cyre, was charged by bill of information with possession of a firearm by a convicted felon, a violation of La. R.S. 14:95.1. He pled not guilty and, following a jury trial, was found guilty as charged. The defendant filed a motion for postverdict judgment of acquittal and/or new trial, which was denied. The trial court sentenced the defendant to fifteen years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The trial court also imposed a $1,000 fine. The State filed a habitual offender bill of information.[1] In exchange for a "double bill" and an agreed upon sentence, the defendant admitted to the prior convictions in the habitual offender bill of information. The trial court adjudicated the defendant a second-felony habitual offender. The trial court vacated the previous sentence and resentenced the defendant to thirty years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The defendant now appeals, designating seven assignments of error.

## FACTS

In January 2018, the defendant was on parole for having previously committed the crime of possession of a firearm by a convicted felon. Agent Steve Everly, with the Department of Public Safety and Corrections, Division of Probation and Parole, supervised the defendant's felony parole. On January 9, 2018, the defendant's wife, Chelsea, drove him to the office of Agent Everly on Columbia Street in Covington, Louisiana, in order to fill out paperwork to facilitate a relocation to Georgia to live with a relative. Chelsea drove the defendant's aunt's Honda Accord because his truck was in the shop being repaired. When the defendant arrived at Agent Everly's office, he was on crutches because he suffered a gunshot

---

[1] The defendant has prior convictions for possession of a firearm by a convicted felon, attempted possession of a firearm by a convicted felon, possession of cocaine, and possession of a Schedule II controlled dangerous substance.

2

wound to the leg. The defendant told Agent Everly that his wife had driven him to the office.

In order to process the paperwork for the defendant's transfer to Georgia, the defendant was required to pay a fee. Therefore, the defendant left the parole office and went to the post office to obtain a $150.00 money order for the transfer fee. While the defendant was gone, Agent Everly obtained approval from his supervisor, Agent Lindy Lousteau, with the Department of Public Safety and Corrections, Division of Probation and Parole, to search the vehicle in which the defendant had arrived (the Accord). When the defendant returned from the post office, Agent Everly told him he was going to search the vehicle. Agent Everly asked the defendant if there was anything in the vehicle that he should not have, and the defendant replied that there was not. The defendant then began texting on his phone. When Agent Everly observed the defendant texting, he took the defendant's phone. When Agent Everly looked at the phone screen, he saw that the defendant sent a text to Chelsea which said, "Get that gun from underwear rite [sic]," and that Chelsea responded, "Put it wear [sic]."

After reading the text messages, Agent Everly brought the defendant to Supervisor Lousteau's office. Agent Everly then enlisted the help of two other agents, including Agent Christopher Howell, with the Department of Public Safety and Corrections, Division of Probation and Parole. The three agents went to the parking lot to search the vehicle. While they were in the parking lot, Chelsea called the defendant's phone, which was still in the possession of Agent Everly. Agent Everly answered the phone and asked Chelsea where she was located. Chelsea then directed the agents to her location. The agents approached the Accord, Agent Everly asked Chelsea where the gun was, and she told him that it was underneath the driver's seat. Agent Howell removed the gun from the car, a .40 caliber Glock handgun, and gave it to Agent Everly.

Agent Everly returned to Supervisor Lousteau's office. He **Mirandized** the defendant and asked him about the gun. The defendant told him that his aunt bought the gun and gave it to him "for safety, because he was in fear of his life." The defendant was subsequently arrested.

Chelsea testified at trial that the defendant did not know about the gun in the vehicle until they had arrived at the post office, and Chelsea had told him that she inadvertently discovered the gun under the seat. Priscilla Vaughn, the defendant's aunt whose Accord the defendant had borrowed, testified at trial that she bought the Glock gun and kept it in her vehicle for her protection when going to work. She indicated that she did not give the gun to the defendant.

The defendant did not testify at trial.

## ASSIGNMENT OF ERROR NO. 1

In his first assignment of error, the defendant argues that the trial court erred in denying his motion to suppress the evidence. Specifically, the defendant contends that there was no reasonable suspicion to search the vehicle; that the search was not of the defendant's vehicle; and that no consent was given to search the vehicle.

Trial courts are vested with great discretion when ruling on a motion to suppress. **State v. Long**, 2003-2592 (La. 9/9/04), 884 So.2d 1176, 1179, cert. denied, 544 U.S. 977, 125 S.Ct. 1860, 161 L.Ed.2d 728 (2005). When a trial court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the trial court's discretion, i.e., unless such ruling is not supported by the evidence. See **State v. Green**, 94-0887 (La. 5/22/95), 655 So.2d 272, 280-81. However, a trial court's legal findings are subject to a *de novo* standard of review. See **State v. Hunt**, 2009-1589 (La. 12/1/09), 25 So.3d 746, 751. In determining whether the ruling on defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence given at the trial of the case. **State v.**

4

**Brooks**, 92-3331 (La. 1/17/95), 648 So.2d 366, 372.

At the motion to suppress hearing, Agent Everly established the following. The defendant arrived at his office on crutches. The defendant, who had been shot two months before, explained to Agent Everly that his wife, Chelsea, drove him to the office. Agent Everly ran a drug screen on the defendant, who tested positive for marijuana, benzodiazepine, and oxycodone. The defendant told Agent Everly that he had prescriptions for the benzodiazepine and oxycodone, but did not have those prescriptions with him. Agent Everly and the defendant filled out paperwork that would enable the defendant to transfer to a different jurisdiction, namely Atlanta, Georgia. Agent Everly then texted Supervisor Lousteau to see if he should search the vehicle in which the defendant had arrived Supervisor Lousteau approved the search of the vehicle. As Agent Everly walked out of his office to go to the vehicle, he noticed that the defendant stayed behind and was texting on his phone. Agent Everly took the defendant's phone and saw the following text: "Get that gun from underwear rite [sic]." The reply to this was, "Put it wear [sic]." With his own phone, Agent Everly took a screen shot of this text.

Agent Everly enlisted the help of two other agents to conduct the search. The agents went outside to find the vehicle in which defendant arrived. Agent Everly still had the defendant's phone. Chelsea called the defendant's phone, and Agent Everly answered the phone and asked Chelsea where she was located. Chelsea signaled her position, and the agents went to the vehicle. Agent Everly directed Chelsea to tell him where the gun was located. Chelsea told Agent Everly that the gun was under the driver's seat. Agent Howell removed the gun and gave it to Agent Everly, who unloaded the gun before going back inside. According to Agent Everly, the handgun was a .40 caliber Glock, fully loaded; that is, it had a full magazine with a round in the "pipe."

The defendant argues in brief that there was no reasonable suspicion to search

the vehicle. According to the defendant, evidence of his gunshot wound and positive drug screen had no connection to the vehicle. Further, the defendant avers that there was no reasonable suspicion that evidence would be found in the vehicle because of the length of time that had passed. Specifically, the defendant pointed out that it had been 65 days since the gunshot wound occurred, and that marijuana can stay in your system for up to ten days after consumption.

The Fourth Amendment to the United States Constitution and Article I, § 5, of the Louisiana Constitution protect people against unreasonable searches and seizures. Subject only to a few well-established exceptions, a search or seizure conducted without a warrant issued upon probable cause is constitutionally prohibited. Once a defendant makes an initial showing that a warrantless search or seizure occurred, the burden of proof shifts to the State to affirmatively show it was justified under one of the narrow exceptions to the rule requiring a search warrant. **State v. Lowery**, 2004-0802 (La. App. 1st Cir. 12/17/04), 890 So.2d 711, 717, writ denied, 2005-0447 (La. 5/13/05), 902 So.2d 1018. See La. Code Crim. P. art. 703(D); **State v. Hood**, 2012-0006 (La. App. 1st Cir. 6/8/12), 2012 WL 2061512 *2 (unpublished), writ denied, 2012-1579 (La. 1/25/13), 105 So.3d 64.

A parolee has a reduced expectation of privacy, subjecting him to reasonable warrantless searches of his person and residence by his parole officer. See **State v. Malone**, 403 So.2d 1234, 1238 (La. 1981); **State v. Hamilton**, 2002-1344 (La. App. 1st Cir. 2/14/03), 845 So.2d 383, 387, writ denied, 2003-1095 (La. 4/30/04), 872 So.2d 480. The reduced expectation of privacy is a result of the parolee's conviction and agreement to report to a parole officer and to allow that officer to investigate his activities in order to confirm compliance with the provisions of his parole. **Hamilton**, 845 So.2d at 387. A parole officer's powers, however, are not without some restraints. A parole officer may not use his authority as a subterfuge to help another police agency that desires to conduct a search, but lacks the necessary

6

probable cause. The parole officer must believe that the search is necessary in the performance of his duties and reasonable in light of the total circumstances. **Id.**

It is an appropriate function of a parole officer to conduct unannounced, random checks on parolees. A parolee agrees to submit to such unannounced visits from his parole officer as a condition of parole. **Hamilton**, 845 So.2d at 387. A probationer has essentially the same status as a parolee. **Malone**, 403 So.2d at 1238; **Hood**, 2012 WL 2061512 at *2. A probation officer's decision to search must be supported by something more than a mere hunch; however, a reasonable suspicion that criminal activity is occurring will suffice. The officer is not required to have probable cause to conduct the search. To require otherwise would place unnecessary obstacles in the path of a probation officer who is performing his job of supervising the individual assigned to him. **Malone**, 403 So.2d at 1239.

In this matter, the defendant, a parolee, had just recently been involved in a shooting, he was on parole for a previous conviction of La. R.S. 14:95.1 (possession of a firearm by a convicted felon), and he had just tested positive for having marijuana in his system. Agent Everly noted as much at the motion to suppress hearing when he explained that he had texted his supervisor about searching the vehicle because the defendant "was involved in a shooting, and he tested positive for marijuana."

In fact, the defendant's positive drug screen for marijuana, alone, provided Agent Everly with reasonable suspicion that the defendant, a parolee, had committed a crime. Whatever other subjective motivations Agent Everly may have had to search the vehicle, such as the text message, were of no consequence. The fact that the officer does not have the state of mind that is hypothecated by the reasons that provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action. **Whren v. United States**, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996).

7

Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis. **Id**.

The defendant suggests in brief that a "positive drug screen does not give rise to reasonable suspicion that criminal activity **is occurring**," particularly for marijuana since, according to the defendant, a casual user of marijuana may test positive for marijuana "up to 10 days after consumption." (Emphasis in original). Whether the defendant smoked marijuana just prior to entering Agent Everly's office or hours before is of no moment. That the defendant possessed marijuana at some point in the recent past was enough to establish that a crime *had been committed* while the defendant was on parole, rather than was *occurring* at that moment, as suggested by the defendant. When the defendant was released on parole in December of 2015, he signed a Department of Public Safety and Corrections Diminution of Sentence form, which provided a list of conditions under which parole was granted. The ninth condition in this list provides: "I agree to visits at my residence or place of employment by my Parole Officer at any time. I also agree to searches of my person, property, residence, and/or vehicle, when reasonable suspicion exists that I am or have been engaged in criminal activity." See La. R.S. 15:574.4.2(A)(2)(i).[2]

In the similar case of **State v. Thomas**, 96-2006 (La. App. 4th Cir. 11/6/96), 683 So.2d 885, defendant, a probationer, met her probation and parole officer, Agent Morantine at her office. A routine urine test was conducted, and defendant tested positive for cocaine. While Agent Morantine waited for the police to come and arrest defendant, two other probation officers searched the vehicle defendant had driven to the office. The officers seized defendant's purse from the vehicle, emptied it, and discovered a matchbox that held a glass container with burnt residue on it.

---

[2] Under this statutory provision, the committee on parole may require the parolee to conform to conditions of parole, including to agree to searches of person, property, residence, or vehicle, when reasonable suspicion exists that criminal activity has been engaged in while on parole.

Defendant was arrested for possession of drug paraphernalia. **Id.** at 886. The fourth circuit found that a search of defendant's vehicle and belongings after she tested positive for drugs, done in accordance with the usual practice of the probation office, was entirely reasonable and did not require a warrant. **Id.** at 888.

The defendant in brief cites to **State v. Clay**, 2017-424 (La. App. 5th Cir. 5/23/18), 248 So.3d 665, 667-69, wherein defendant, a parolee, was subjected to a warrantless search of his residence and vehicle, referred to by the State as a compliance check. The search of defendant's vehicle resulted in the seizure of a handgun. At the hearing on the motion to suppress the evidence, it was learned that Gretna Police Department Detective Alfred Disler (who was handling defendant's case) was contacted by Jefferson Parish Sheriff's Office Agent Pat DiGiovanni, who stated he had spoken to an informant who told him that a suspect in an "unrelated investigation," identified as defendant, was involved in an armed robbery in Lafourche Parish. Detective Disler also learned from Agent DiGiovanni that the informant had advised him that defendant was selling guns from a residence located behind a Circle K convenience store. They conducted a computer search and learned that defendant was on parole for a previous 2004 armed robbery conviction. At that point, Detective Disler contacted Agent Justin Edgecombe of the Louisiana Department of Probation and Parole to advise him of the investigation involving defendant. Agent Edgecombe confirmed to Detective Disler that defendant was on parole and provided him with the address defendant had listed with Probation and Parole. According to Detective Disler, he also contacted other members of the Gretna Police Department to assist in the anticipated compliance check of defendant's residence, where officers found marijuana, a pipe, a drug test kit, and a scale. The trial court denied the motion to suppress.

The fifth circuit reversed the trial court's ruling, finding that defendant's parole officer used his authority as a subterfuge to help another police agency that

9

desired to conduct a search, but lacked the necessary probable cause. **Clay**, 248 So.3d at 679. The fifth circuit found there was no justification for any search because there was no reasonable suspicion of any criminal activity by defendant. The fifth circuit stated: "In short, reviewing the totality of the circumstances, we find a complete lack of evidence to prove that Probation and Parole had reasonable suspicion that criminal activity was occurring prior to participating in the compliance check and subsequent warrantless search of defendant's residence and vehicle." **Id**. at 680.

The defendant's reliance on **Clay** is misplaced. In the instant matter, the positive drug screen test revealed to Agent Everly that the defendant had committed a crime, namely possession of marijuana, and was therefore in violation of his parole at that moment, even before the vehicle was searched. In **Clay**, the State failed to show that any of the officers involved in the search of defendant's residence and vehicle had any reasonable suspicion whatsoever (much less probable cause) that defendant had committed any crime. As the fifth circuit in **Clay** pointed out, "[t]here is a complete lack of evidence in the record establishing that the agents from Probation and Parole possessed sufficient—or any—reasonable suspicion that criminal activity was occurring that would justify their warrantless search of defendant's residence and vehicle." **Clay**, 248 So.3d at 683.

The defendant further argues in brief that the search of his cell phone did not cure the lack of reasonable suspicion. The defendant notes that the warrantless search of a cell phone is unconstitutional even when incident to a lawful arrest. See **Riley v. California**, 573 U.S. 373, 386, 134 S.Ct. 2473, 2485, 189 L.Ed.2d 430 (2014) (holding that officers must generally secure a warrant before conducting a search of data on cell phones).

As discussed above, Agent Everly had reasonable suspicion that the defendant had committed a crime (possession of marijuana) *before* he took the defendant's

10

phone. That is, notwithstanding any text that may or may not have been observed, Agent Everly, based on reasonable suspicion of a crime, was heading to the vehicle in which defendant had arrived. Moreover, it is not clear that Agent Everly searched the defendant's phone for Fourth Amendment purposes. Agent Everly explained that when he saw the defendant texting in his office, he told the defendant he was not allowed to text and took the phone. When Agent Everly looked at the phone screen, he saw the text from the defendant stating "Get that gun" and the reply text of "Put it wear [sic]."

An exception to the search warrant requirement is the plain-view exception. Two conditions must be satisfied to trigger the applicability of the doctrine: (1) there must be a prior justification for an intrusion into the protected area; (2) it must be immediately apparent without close inspection that the item is evidence or contraband. See **Horton v. California**, 496 U.S. 128, 135-137, 110 S.Ct. 2301, 2307, 110 L.Ed.2d 112 (1990); **State v. Howard**, 2001-1487 (La. App. 1st Cir. 3/28/02), 814 So.2d 47, 53, writ denied, 2002-1485 (La. 5/16/03), 843 So.2d 1120. While the text itself was not contraband, it was evidence that there was likely contraband in the car the defendant was in. Accordingly, the viewing of the text on the cell phone arguably fell under the plain view exception to the warrant requirement. In any event, as noted, Agent Everly was going to search the vehicle, regardless of the discovery of any text messages; as such, the gun inevitably would have been found. See **Nix v. Williams**, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984).

Finally, the defendant argues in brief that no consent was given to search the vehicle, and Agent Everly should not have had the right to search a third-party vehicle that did not belong to the defendant. Regarding consent, Agent Everly was not required to obtain consent from either the defendant or Chelsea to search the vehicle. By virtue of the Diminution of Sentence form the defendant signed as a

11

parolee, he gave his consent to search the moment there was reasonable suspicion that he was engaging or had been engaging in criminal activity. Moreover, when Agent Everly learned that there was a gun in the vehicle, exigent circumstances gave him the right to search without a warrant or consent. <u>See</u> **State v. Brumfield**, 2005-2500 (La. App. 1st Cir. 9/20/06), 944 So.2d 588, 595-98, <u>writ denied</u>, 2007-0213 (La. 9/28/07), 964 So.2d 353.

Additionally, the defendant's argument that Agent Everly could not search the vehicle (without consent) because it was not owned by the defendant is baseless. The vehicle searched was the vehicle that the defendant rode in to get to Agent Everly's office.

In **Pennsylvania v. Labron**, 518 U.S. 938, 940, 116 S.Ct. 2485, 2487, 135 L.Ed.2d 1031 (1996) (per curiam), the United States Supreme Court held that if a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits the police to search the vehicle without more. When Agent Everly learned there was a gun in the vehicle and that the defendant's wife was still in the vehicle, he had the right to search that vehicle because he had probable cause to believe the vehicle contained contraband or evidence of a crime. Ownership of the vehicle was irrelevant. <u>See</u> **State v. Williams**, 38,379 (La. App. 2nd Cir. 11/25/03), 858 So.2d 878, 880-81, <u>writ denied</u>, 2003-3535 (La. 3/12/04), 869 So.2d 807 (finding that the facts known to the arresting police officer gave probable cause to search and seize contraband from the vehicle, where the non-owner passenger of the car gave consent after the non-owner driver refused consent). This is the same principle that allows the police, who have probable cause to search an entire vehicle, to also open any container inside the vehicle, without regard to who might own each container. <u>See</u> **United States v. Ross**, 456 U.S. 798, 825, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982); **State v. Jackson**, 2009-1983 (La. 7/6/10), 42 So.3d 368, 374 (per curiam).

Based on all of the foregoing, Agent Everly had reasonable suspicion, as well as probable cause, to search the vehicle and seize the gun that was in it. The trial court did not err or abuse its discretion in denying the motion to suppress the evidence.

Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2

In his second assignment of error, the defendant argues the trial court erred in denying his motion to suppress his statement to Agent Everly. Specifically, the defendant contends that he was not properly **Mirandized** before being questioned by Agent Everly.

It is well-settled the ruling in **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) protects an individual's Fifth Amendment privilege during incommunicado interrogation in a police-controlled atmosphere. In **Miranda**, 384 U.S. at 444, 86 S.Ct. at 1612, the Supreme Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Thus, before a confession or inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his **Miranda** rights, that he voluntarily and intelligently waived those rights, and that the statement was made freely and voluntarily and not under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La. Code Crim. P. art. 703(D); La. R.S. 15:451. **Hunt**, 25 So.3d at 754. See **State v. Patterson**, 572 So.2d 1144, 1150 (La. App. 1st Cir. 1990), writ denied, 577 So.2d 11 (La. 1991). Whether or not a showing of voluntariness has been made is analyzed on a case-by-case basis with regard to the facts and circumstances of each case. The trial court must consider the totality of the circumstances in deciding whether a confession is admissible.

13

**State v. Williams**, 2001-0944 (La. App. 1st Cir. 12/28/01), 804 So.2d 932, 944, <u>writ denied</u>, 2002-0399 (La. 2/14/03), 836 So.2d 135.

Although the burden of proof is generally on the defendant to prove the grounds recited in a motion to suppress evidence, such is not the case with the motion to suppress a confession. In a motion to suppress a purported confession, the burden of proof is with the State to prove the confession's admissibility. La. Code Crim. P. art. 703(D). Since the general admissibility of a confession (or inculpatory statement) is a question for the trial court, its conclusions on the credibility and weight of the testimony are accorded great weight and will not be overturned unless they are not supported by the evidence. **Patterson**, 572 So.2d at 1150. In determining whether the ruling on the defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence given at the trial of the case. **Brooks**, 648 So.2d at 372.

The defendant argues that Agent Everly "started questioning" him before advising him of his **Miranda** rights. Further, according to the defendant, Agent Everly was not credible because, while he indicated that a short time elapsed between the commencement of questioning and the reading of his rights, the only documentary evidence shows that he was arrested at 2:00 p.m. and advised of his rights at 2:00 p.m. The defendant avers that this means that he waived his rights "at precisely the same time as his arrest." The defendant notes that Agent Everly testified that the defendant finished giving his statement before he was arrested. According to the defendant, even if he was properly advised of his rights at some point during his inculpatory statement, the State did not prove which portions of his inculpatory statement occurred before being advised of his rights and which portions occurred after being advised of his rights.

We address first the defendant's assertion that Agent Everly "started

14

questioning" him before being **Mirandized**. After securing the gun, Agent Everly returned to Supervisor Lousteau's office, where the defendant was located. At the motion to suppress hearing, Agent Everly testified that as he "started speaking with the defendant," another agent passed the office and asked if Agent Everly had read him his rights. At that point, Agent Everly **Mirandized** the defendant. Agent Everly then testified at the suppression hearing: "I read him his rights. He stated that his aunt had bought the gun and given it to him for protection. He was very, I would say, contrite." Despite the defendant's contention, there was nothing in this testimony that indicated the defendant confessed before being **Mirandized**.

At trial, Agent Everly testified that when he got back to Supervisor Lousteau's office, he informed her about what he and the other agents had found. He then advised the defendant of his **Miranda** rights via a card that he kept in his wallet. Agent Everly further testified that the defendant stated that he understood his rights, and that he agreed to waive those rights and speak to him. When asked what the defendant said, Agent Everly testified: "He was very contrite knowing that we found a gun. He said he didn't want to go to jail, that his aunt had bought the gun and given it to him for security, for safety, because he was in fear of his life." Agent Everly further indicated that he did not record the defendant's statement, and that he thought Agent Howell heard the defendant's inculpatory statement because Agent Howell was standing close by Supervisor Lousteau's office door.

Agent Howell testified at trial that he was actually in Supervisor Lousteau's office when he heard the defendant say that his aunt had given him the firearm for protection. Supervisor Lousteau testified at trial that Agent Everly had the defendant sit in her office while the vehicle was searched. According to Supervisor Lousteau, when Agent Everly returned to her office, he produced the handgun found in the vehicle. Supervisor Lousteau indicated that at this point, Agent Everly "read him his **Miranda** rights and questioned him about the weapon, about the firearm that he

15

found." When Supervisor Lousteau was asked on direct examination about what she heard, the following exchange took place:

A. I remember hearing him acknowledge his rights, and he admitted that the gun was out there and that there was attempts to hide it, but at that point, he was willing to come clean. And he was actually very, you know, sincere and stayed calm, but he admitted what he did wrong, and he admitted that he knew it was there and that he had -- it wasn't his. He did not buy it, but it was given to him.
Q. Did you learn who it was given to him by?
A. He said it was his aunt, but I don't recall her name.
Q. During that interaction, was your office door open or closed?
A. Open. It stays open.
Q. Tell me about the environment in the office. Was anybody screaming and shouting?
A. No, ma'am.
Q. Did anybody threaten or coerce the suspect into saying anything?
A. No, ma'am.

Regarding the defendant's contention that Agent Everly lacked credibility because the advisement of rights and arrest were documented as having occurred at the same time, we note the following exchange with Agent Everly on cross-examination:

Q. Now, are you as sure as you are about the rest of your testimony that you read Ronald St. Cyre his rights prior to him making a statement?
A. Yes.
Q. And, in fact, that you've read him the rights that were on the **Miranda** form, correct?
A. I read him both of them, yes. I read them off the card, and I read them again at the jail when I went and booked him.
Q. I'm going show you State's Exhibit 8. Can you tell me under the line that says "agent informing" -- what does it say? Agent informing what?
A. Prisoner signature, witness. There's my signature right there.
Q. Agent informing prisoner?
A. Yes.
Q. Whose signature is on that line?
A. No one.
Q. No one? How could no one's signature be on that line?
A. I signed the witness, where I witnessed it.
Q. Is that a mistake?
A. Probably. I was trying to get his arrest report done.
Q. Are you sure you read him his rights that day?
A. Yeah, I witnessed it right there. He signed it. He signed the document, and I witnessed him signing the document.
Q. Were you a witness to the person advising him of his rights, or did you advise him of his rights?
A. I advised him of his rights.

16

Q. That's you're [sic] testimony?

A. That's my testimony.

Q. That's not what his document says. His document just says you were a witness.

A. Okay. My testimony is I read him his rights, and I witnessed his signing it. I think I may have signed the wrong block, but I witnessed him sign that, yes.

Q. Then it's just another mistake?

A. No.

Q. Who are the other witnesses?

A. Lindy Lousteau.

Q. That's your supervisor, correct?

A. Yes.

Q. So Ms. Lousteau went to the jail with you then, right?

A. No.

Q. Well, didn't you testify that that's where you got this signed?

A. I got this signed at the jail, yes, but she witnessed.

Q. Ms. Lousteau didn't go with you?

A. No. She witnessed me give him the **Miranda** rights in her office. She witnessed that that is a true thing right there.

Q. So she didn't witness Ronald St. Cyre sign this form?

A. No.

Q. You just got the form witnessed later, right?

A. No. He was read his **Miranda** rights twice. She signed that he was read his rights.

Q. Can you go to your arrest report, D 1?

A. Yes.

Q. What's the time of arrest that you noted on your arrest report?

A. About 2:00 o'clock.

Q. Was it about 2, or does it say 2:00 p.m.?

A. 2:00 p.m.

Q. What's the time on State's Exhibit 8 that you said you read him his rights?

A. 2:00 p.m.

Q. 2:00 p.m., okay. We just went through the timeline, Agent. You read him his rights. That's what you testified to, right?

A. Yes.

Q. You questioned him for you don't know how long, and then you arrested him?

A. Yes.

Q. So why does the rights form say you've read him his rights at 2, and your arrest report says you arrested him at 2? How do you do it all at the same time?

A. It's the same form. It's the same thing. He was read his **Miranda** rights, and that's when I signed. I read them twice, but he signed at 2:00 o'clock, 2:00 o'clock is the same timeframe.

Q. So he waived his rights at the same time he was arrested?

A. Yes.

Q. Same exact time simultaneously?

A. Yes.

Q. When did he make a statement then?

A. After I arrested him. After I read him his **Miranda** rights.

Q. You just testified, we just went through it. **Miranda** rights,

statement, arrest.
A. Yes.
Q. They can't be all done at the same time?
A. It was all at the same time. It's the same time.
Q. It was all at 2:00 p.m.? It all happened 2:00 p.m.? It didn't even take a second? Is that what you're testifying to?
A. No. The arrest time was 2:00 o'clock.
Q. As well as the time you read him his rights?
A. It's all the same timeframe.

Considering the great weight accorded a trial court's conclusions regarding credibility, we find no reason to disturb the trial court's ruling in denying the motion to suppress the defendant's inculpatory statement. Testimony of the interviewing police officer alone may be sufficient to prove a defendant's statements were freely and voluntarily given. **State v. Maten**, 2004-1718 (La. App. 1st Cir. 3/24/05), 899 So.2d 711, 721, writ denied, 2005-1570 (La. 1/27/06), 922 So.2d 544. Agent Everly testified that he **Mirandized** the defendant, then got his statement, and then arrested him. Whether all this happened around 2:00 p.m. or in quick succession is of no moment. This was a credibility issue, and the trial court chose to believe the testimony of Agent Everly. Further, Supervisor Lousteau also testified she heard Agent Everly **Mirandize** the defendant, then question him about the gun.

Based on the foregoing, we find no error in the trial court's conclusion that the defendant was **Mirandized** before making the inculpatory statement. Further, the statement was freely and voluntarily given. Accordingly, the trial court did not err or abuse its discretion in denying the motion to suppress the statement.

This assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 3

In his third assignment of error, the defendant argues that the trial court erred in permitting the State to present prejudicial evidence without probative value to the jury after previously ruling such evidence inadmissible.

Louisiana Code of Evidence article 404(B)(1) provides:

Except as provided in Article 412, evidence of other crimes, wrongs, or

18

acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

Generally, evidence of criminal offenses other than the offense being tried is inadmissible as substantive evidence because of the substantial risk of grave prejudice to the defendant. In order to avoid the unfair inference that a defendant committed a particular crime simply because he is a person of criminal character, other crimes evidence is inadmissible unless it has an independent relevancy besides simply showing a criminal disposition. **State v. Lockett**, 99-0917 (La. App. 1st Cir. 2/18/00), 754 So.2d 1128, 1130, <u>writ denied</u>, 2000-1261 (La. 3/9/01), 786 So.2d 115. The trial court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. <u>See</u> **State v. Galliano**, 2002-2849 (La. 1/10/03), 839 So.2d 932, 934 (per curiam).

Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. Code Evid. art. 401. All relevant evidence is admissible except as otherwise provided by positive law. Evidence which is not relevant is not admissible. La. Code Evid. art. 402. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, or waste of time. La. Code Evid. art. 403.

Pretrial, the State filed a notice of intent and an amended notice of intent to introduce other crimes evidence, or res gestae, pursuant to La. Code Evid. art. 404(B). The state's notice included evidence that the defendant had been shot and was recovering from a gunshot wound when the events of the instant case transpired;

19

that the defendant was given a drug screen and tested positive for marijuana, benzodiazepine, and oxycodone; that the defendant admitted to recently using marijuana; and that marijuana crumbs were located on the floorboard behind the driver's seat next to the gun.

At the motion to suppress hearing, Agent Everly testified that on or around November 27, 2017, he received a call from a detective with the Sheriff's Office notifying him that the defendant had been involved in a shooting.[3] The detective sent Agent Everly a report about the incident and, according to Agent Everly, it was reported to be an attempted carjacking, and the defendant returned fire with two handguns.

At the **Prieur** hearing, see **State v. Prieur**, 277 So.2d 126, 130 (La. 1973), the State indicated that, while it intended to introduce the fact that the defendant had been shot, it did not intend to introduce evidence that the defendant returned fire. The trial court ruled that the fact that the defendant was shot on November 5, 2017 was admissible. The trial court also ruled, "Further information about that shooting, unless there's other material developments in the trial, will not be admitted." Finally, the trial court ruled that absent any further developments in the case, the drug test and marijuana crumbs were inadmissible. The trial court added, however, that it "can see circumstances where that door might be opened."

During the State's case-in-chief, none of the prohibited evidence was addressed. Agent Everly testified at trial that he attempted several times to contact the defendant in person, in November and December of 2017, but was never able to meet with him. Agent Everly finally made contact with the defendant in late December of 2017, and told him to be in his office that day. The defendant did not show up on that day. Agent Everly contacted the defendant again, and told him to

---

[3] At the **Prieur** hearing, defense counsel indicated the defendant had been shot on November 5, 2017.

20

be in his office on January 3, 2018. The defendant again did not show up, but unexpectedly, without an appointment, arrived at Agent Everly's office on January 9, 2018. On cross-examination, defense counsel attempted to impeach Agent Everly's credibility regarding his alleged attempts to contact the defendant. That is, defense counsel sought to show that the defendant had, in fact, made contact with Agent Everly several times in November and that the agent was not being truthful when he testified that he never talked to the defendant around this time.

In the defendant's case-in-chief, Chelsea testified that she overheard several phone conversations the defendant had with Agent Everly in November 2017. According to Chelsea, the defendant told Agent Everly what was going on, and that he was going to come in to see him; he also gave the agent his new address and new cell phone number. Later, defense counsel asked Chelsea, "Can you tell me what really happened January 9, 2018?" Chelsea indicated the following. They drove to Agent Everly's office, and she stayed in the defendant's aunt's car with her baby. She discovered a gun under the seat. The defendant came back to the car to go to the post office to obtain a money order (for the paperwork transfer fee). At the post office, Chelsea told the defendant about the gun, and the defendant told her that he did not know what it was for, and told her not to mess with it. Later, when she got the text message, "Get that gun from underwear rite," she did not know what it meant. When the agent approached her and told her to tell him where the gun was, she said it was underneath the driver's seat. Chelsea testified that the defendant did not know there was a gun under the seat. She also testified that the defendant never looked at the gun.

Then the following relevant exchange took place between Chelsea and defense counsel:

Q. What was Ronald doing for a living prior to this arrest?
A. Working driving trucks for Champagne Beverage.
Q. I'm going show you some documents, and I'm going to mark them

21

as D 23, D 24, and D 25. Can you identify Exhibit D 23 for this jury?

A. Yes. That's his CDL license that he -- well, certificate diploma for school.

Q. Is that a photograph of the diploma?

A. Oh, yes.

Q. Did you take that photograph?

A. Yes, I did.

Q. When did Ronald get his commercial truck driver's license?

A. The 16th of March. I'm sorry, the 29th.

Q. Of what year?

A. '16.

Q. And would that have been after he got out of jail from 2012?

A. Yes.

Q. I'm going to show you another picture I'm going mark for identification as D 24. Did you take that photograph?

A. Yes, I did.

Q. Can you identify it?

A. Yes. This is his TWIC card.

Q. A TWIC card. When did he get that?

A. In '16.

Q. In 2016. Again, was that after he got out of jail in 2012?

A. Yes.

Q. I'm going to show you this and it's marked D 25. Can you recognize that photograph?

A. Yes.

Q. Did you take that photograph?

A. Yes, I did.

Q. What is that?

A. This is GED, his diploma.

Q. When did he get his GED?

A. February of '16.

Q. So after Ronald got out of jail, he got his GED, he got a TWIC card, and he got a commercial driver's license?

A. Yes.

Q. You were with him at the time he got all of these things?

A. Yes, I was, and he worked so hard to get that. Hard.

Q. He had to take a test to get his GED?

A. Yes, he had to take a test for that that he failed and he continued to go back and strive to get. His TWIC card he got denied for three times that he fought for, didn't give up and went back and got. And also his commercial truck driver's license, he had to take a test for that, and he also failed that the first time, but he continued to go back and strived to get that, and he got everything that he needed.

Following brief cross-examination of Chelsea, a bench conference was held.

The State argued that the defense, through Chelsea, had offered character evidence and that, as such, it (the State) had the right to go into specific incidents of bad acts of the defendant. The jury was excused, and the State provided to the trial court a list of other crimes or bad acts, including several prior convictions, it sought to

introduce. Defense counsel argued that what Chelsea had testified to was not character evidence. The jury was dismissed for the evening, and the trial court continued the **Johnson** hearing[4] to the following day.

The next day, with the jurors in the jury room, the trial court resumed the **Johnson** hearing. The State had prepared a memorandum in support of its motion to rebut the defendant's character evidence. Defense counsel addressed the State's memorandum. In ruling partially in favor and partially against the State, the trial court provided the following, in pertinent part:

> This Court has reviewed cases going back into the 1930s dealing with evidence of good character and purported rebuttal or evidence confronting that witness to determine whether that would make a difference in their testimony.
> I've also had prepared a partial transcript, which both counsel have been made aware of and have been given access to and copies of in preparation for this ruling.
> The statements by the witness are evidence of good character, and thus, evidence which may be admitted to confront the witness under 404 is admissible. The caveat is that evidence post-release from the, what I believe to be, a felon with a firearm in 2012 is more probative than prejudicial, or unduly prejudicial on that point. Evidence prior to the 2012 release from incarceration, whenever that date may have been, is not admissible.
> Further, I've made a determination earlier that the reliability of the evidence in the **Johnson** hearing that was urged to me of alleged marijuana crumbs on January 9th of 2018 is not substantial enough to allow it to pass a **Johnson** hearing test.

The trial court also ruled that the defendant's admission to recently using marijuana was admissible.

Following is the relevant cross-examination of Chelsea that the defendant contends was prejudicial:

> Q. Ms. St. Cyre, have you heard that on the date of the incident for which we're in court today, on that date, your husband, Mr. St. Cyre, admitted to marijuana use?
> A. No.
> Q. Have you heard that prior to this incident, your husband was involved in a shooting in November of '17?
> A. Yes.
> Q. And when those individuals opened fire on your husband, he was

---

[4] See **State v. Johnson**, 389 So.2d 372 (La. 1980).

actually holding your infant daughter?

A. Yes.

Q. And that when that happened, he dropped your daughter and retrieved a firearm from his own vehicle?

A. I wasn't there when that happened.

Q. And have you heard that your husband actually returned fire?

A. No. I wasn't there.

Q. Have you heard that marijuana was located in his residence?

A. No.

Q. Are you aware that Mr. St. Cyre told his parole officer that the firearm that was located in the vehicle on the date of this incident for which we're here for trial, he told his parole officer that it was his aunt's and she gave it to him for protection?

A. No, she didn't give it to him.

Q. I asked are you aware that your husband made the statement that she did give it to him for protection?

A. No.

The defendant argues in brief that the direct examination of Chelsea about the defendant's job and schooling was not character evidence because there was no foundation laid for Chelsea's knowledge of the defendant's reputation in the community. As such, the State should have been prohibited from asking Chelsea on cross-examination about specific acts by the defendant. The defendant further contends that the prejudice by the State's cross-examination was compounded because the State was allowed to ask improper questions without foundation. According to the defendant, the trial court failed to consider three of the five **Johnson** factors; namely, it did not consider whether there was reasonable likelihood of generalized knowledge of the defendant's previous misconduct within his community; it did not consider whether the cross-examination concerned the specific trait involved in possession of a firearm by a convicted felon; and it did not determine that the examination would be in proper form.

Louisiana Code of Evidence article 608 provides:

**A. Reputation evidence of character.** The credibility of a witness may be attacked or supported by evidence in the form of general reputation only, but subject to these limitations:

(1) The evidence may refer only to character for truthfulness or untruthfulness.

(2) A foundation must first be established that the character witness is familiar with the reputation of the witness whose credibility is in issue. The character witness shall not express his personal opinion as to the character of the witness whose credibility is in issue.

(3) Inquiry into specific acts on direct examination while qualifying the character witness or otherwise is prohibited.

**B. Particular acts, vices, or courses of conduct.** Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required.

**C. Cross-examination of character witnesses.** A witness who has testified to the character for truthfulness or untruthfulness of another witness may be cross-examined as to whether he has heard about particular acts of that witness bearing upon his credibility.

One of the comments to Article 608 refers to **Johnson**, regarding the safeguards the trial court should consider before permitting such questioning. See **State v. Law**, 2015-0210 (La. App. 1st Cir. 2/24/16), 189 So.3d 1164, 1175, writ denied, 2016-0926 (La. 4/24/17), 220 So.3d 740. In **Johnson**, 389 So.2d at 376, the supreme court set out the following guidelines that the trial court should consider in determining whether to allow the cross-examination:

"(1) that there is no question as to the fact of the subject matter of the rumor, that is, of the previous arrest, conviction, or other pertinent misconduct of the defendant;
"(2) that a reasonable likelihood exists that the previous arrest, conviction or other pertinent misconduct would have been bruited about the neighborhood or community prior to the alleged commission of the offense on trial;
"(3) that neither the event or conduct nor the rumor concerning it occurred at a time too remote from the present offense;
"(4) that the earlier event or misconduct and the rumor concerned the specific trait involved in the offense for which the accused is on trial; and
"(5) that the examination will be conducted in the proper form, that is: 'Have you heard,' etc., not 'Do you know,' etc.

The trial court herein specifically noted that it was conducting a **Johnson** hearing to determine the extent of cross-examination allowed by the State. The trial court is presumed to know the law, see **State v. Aldridge**, 450 So.2d 1057, 1059 (La. 1984), and there is nothing in the record before us to indicate the trial court did not

25

consider the **Johnson** guidelines in formulating its ruling. Moreover, while the defendant clearly objected to other crimes or bad acts being allowed into evidence, it made no objections regarding any of the three guidelines that he now asserts on appeal were not considered by the trial court. The **Johnson** Court, 389 So.2d at 377, noted that a defendant may not avail himself of these safeguards if he failed to make a contemporaneous objection on these grounds at trial. A defendant is limited on appeal to the grounds for the objections articulated at trial. Generally speaking, a new basis for an objection, albeit meritorious, cannot be raised for the first time on appeal. See La. Code Crim. P. art. 841. At any rate, we see no reason to disturb the trial court's ruling. Defense counsel's questions to Chelsea about the defendant's employment and educational history and what he knew about the gun in the vehicle constituted character evidence and, as such, the State was allowed to rebut such evidence.

Louisiana Code of Evidence article 611(B) provides that a "witness may be cross-examined on any matter relevant to any issue in the case." The scope of cross-examination is not limited to matters covered on direct examination. **State v. Sepulvado**, 93-2692 (La. 4/8/96), 672 So.2d 158, 167, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996). The introduction of evidence of "good character" places character at issue, thereby permitting the State to cross examine the defendant's character witness about his or her knowledge of the defendant's particular conduct, prior arrests, or other acts relevant to the moral qualities pertinent to the defendant's crime and to introduce evidence of the defendant's bad character in rebuttal of the testimony of the defendant's character witness. **State v. Taylor**, 2007-869 (La. App. 5th Cir. 4/29/08), 985 So.2d 266, 269; see La. Code Evid. art. 608(C); La. Code Evid. art. 405(A). Although **Johnson** delineated certain safeguards regulating prosecution cross-examination of character witnesses, the ultimate question is whether there was undue jury prejudice from the prosecutor's

cross-examination.  **Sepulvado**, 672 So.2d at 167.

Chelsea's testimony on direct examination placed the defendant's character for truthfulness squarely before the jury.  Much of what she testified to, regarding the defendant's knowledge of the gun, was in direct contradiction to Agent Everly's testimony.  Without calling the defendant to testify, defense counsel sought to establish the defendant's good character or truthfulness and, therefore, his innocence, through Chelsea.  Accordingly, we find that the scope of the cross-examination of Chelsea was proper.  See La. Code Evid. art. 405(A); La. Code Evid. art. 608(A); La. Code Evid. art. 611(B); **Law**, 189 So.3d at 1176.  See also **State v. Bagley**, 378 So.2d 1356, 1357-58 (La. 1979).

This assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 4

In his fourth assignment of error, the defendant argues the trial court erred when it overruled his objection to the prosecutor's closing argument.

During the prosecutor's rebuttal closing argument, the following exchange took place:

> BY MS. DIECK [prosecutor]:  And not only have these three parole officers testified, we have there's undisputed evidence which provides a motive for this defendant to carry this gun and I told you I don't have to give you a motive, but in my experience, jurors like getting the whole picture, so this is the whole picture.
> Shoot out in front of this man's house less than three months before the date of this offense holding his infant daughter and drops her.
> BY MR. TONRY:  Your Honor, I have an objection.
> (The following proceedings were held at the bench:)
> BY MR. TONRY:  Judge, the prosecutor is talking about evidence that was not brought forth in this case that there was a shootout.  There's only evidence that Ronald St. Cyre was shot.  That's extremely prejudicial to put that evidence before the jury of a shootout.
> BY THE COURT:  It's closing argument.  Overruled, and I'll note your objection.

According to the defendant, the State's remarks about a shootout in front of the defendant's house were based on facts not in evidence.  Further, the defendant contends, the allegation that the defendant dropped his baby was "absolutely

27

prejudicial." Finally, the defendant cites La. Code Crim. P. art. 771 and avers that, at a minimum, the trial court was required to admonish the jury if the State's remarks were irrelevant or immaterial and prejudicial.

The issue as to the propriety of remarks made in closing argument is not preserved for review where defense counsel makes no objection to the statement either during argument or after the argument. See La. Code Crim. P. art. 841(A); **State v. Burge**, 515 So.2d 494, 504-05 (La. App. 1st Cir. 1987), writ denied, 532 So.2d 112 (La. 1988). Defense counsel objected only to the prosecutor's remark about the shootout. There was no objection to or any mention made by defense counsel about the infant daughter being dropped. Thus, that issue is not preserved for review.

Closing arguments in criminal cases should be restricted to the evidence admitted, to the lack of evidence, to conclusions of fact that may be drawn therefrom, and to the law applicable to the case. Further, the State's rebuttal shall be confined to answering the argument of the defendant. La. Code Crim. P. art. 774. Prosecutors are allowed wide latitude in choosing closing argument tactics. See **State v. Draughn**, 2005-1825 (La. 1/17/07), 950 So.2d 583, 614, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). The trial judge has broad discretion in controlling the scope of closing arguments, and this court will not reverse a conviction on the basis of improper closing argument unless thoroughly convinced that the remarks influenced the jury and contributed to the verdict. **State v. Vansant**, 2014-1705 (La. App. 1st Cir. 4/24/15), 170 So.3d 1059, 1063. See **State v. Prestridge**, 399 So.2d 564, 580 (La. 1981).

The prosecutor questioned Chelsea during cross-examination regarding whether she knew anything about the November shooting the defendant was involved in when he retrieved a gun from his vehicle and returned fire. Based on the trial court's ruling that this evidence was permissible, the suggestion that the

28

defendant had engaged in an exchange of gunfire was placed before the jury prior to closing arguments. While the term "shootout" was arguably hyperbolic, the use of this word did not so influence the jury so as to have contributed to the verdict. We also find that the trial court was not required to admonish the jury pursuant to Article 771. In lodging his objection, defense counsel neither moved for a mistrial nor asked the trial court to admonish the jury. See **State v. Lucas**, 99-1524 (La. App. 1st Cir. 5/12/00), 762 So.2d 717, 727.

The trial court in the instant matter instructed the jury, "[o]pening statements and closing arguments made by the attorneys during the trial are not evidence." The trial court continued: "In closing arguments, the attorneys were permitted to present their views on what the evidence has shown or not shown and what conclusions they think may be drawn from the evidence." Much credit should be accorded to the good sense and fairmindedness of jurors who have seen the evidence and heard the argument, and have been instructed by the trial judge that arguments of counsel are not evidence. **Vansant**, 170 So.3d at 1064-65. See **State v. Mitchell**, 94-2078 (La. 5/21/96), 674 So.2d 250, 258, cert. denied, 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996).

The prosecutor's challenged remarks in closing argument were not improper and, as such, the trial court properly overruled defense counsel's objections to these remarks. Moreover, even if improper in any way, the prosecutor's remarks clearly did not contribute to the verdict nor make it impossible for the defendant to obtain a fair trial. See La. Code Crim. P. art. 775; **Vansant**, 170 So.3d at 1064. It is true that, despite the lack of an objection, extremely prejudicial and inflammatory remarks require reversal. See **State v. Hayes**, 364 So.2d 923, 926 (La. 1978); **Burge**, 515 So.2d at 505. Our review of that portion of the prosecutor's closing argument not objected to (but raised for the first time on appeal) convinces us that her remark was not so prejudicial or inflammatory as to require reversal. See **State v. Francis**, 95-

29

194 (La. App. 5th Cir. 11/28/95), 665 So.2d 596, 603.

Based on the foregoing, this assignment of error is without merit.

**ASSIGNMENTS OF ERROR NO. 5**

In his fifth assignment of error, the defendant argues the evidence was insufficient to support the conviction for possession of a firearm by a convicted felon. Specifically, the defendant contends that the State failed to prove his actual or constructive possession of the gun found in the vehicle, or that he had the requisite intent to possess the gun.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See La. Code Crim. P. art. 821(B); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. The **Jackson** standard of review, incorporated in La Code Cr. P. art. 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. **State v. Patorno**, 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144.

Pursuant to La. R.S. 14:95.1, it is unlawful for any person who has been convicted of certain felonies to possess a firearm. To prove a violation of La. R.S. 14:95.1, the State must prove: (1.) the defendant's status as a convicted felon; and (2.) that the defendant was in possession of a firearm. See **State v. Mose**, 412 So.2d 584, 585 (La. 1982). The State must also prove that ten years have not elapsed since the date of completion of the punishment for the prior felony conviction. La. R.S.

30

14:95.1(C)(1).

The only issues raised by the defendant are possession and intent.[5] The defendant asserts in brief that there was insufficient evidence to show he had constructive possession of the gun because he had neither dominion nor control over the weapon. The defendant points out that the gun was registered to the defendant's aunt, and further that the gun was found in his aunt's vehicle, not his vehicle.

Under La. R.S. 14:95.1, actual possession is not a necessary element of the offense, and there is no requirement that the defendant have the firearm on his person to be in violation. Constructive possession satisfies the possessory element of the offense. **State v. Day**, 410 So.2d 741, 743 (La. 1982). Constructive possession of a firearm occurs when the firearm is subject to the defendant's dominion and control. See **State v. Plain**, 99-1112 (La. App. 1st Cir. 2/18/00), 752 So.2d 337, 340-41 (constructive possession was found where the defendant admitted to having the weapon underneath the mattress in his bedroom); **State v. Frank**, 549 So.2d 401, 405 (La. App. 3rd Cir. 1989) (where a gun was in plain view on the front seat of a car defendant was driving but did not own, the court found constructive possession).

Dominion and control over a weapon constitutes constructive possession even if it is only temporary and even if the control is shared. See **Plain**, 752 So.2d at 340; **State v. Melbert**, 546 So.2d 948, 950 (La. App. 3rd Cir. 1989); **State v. Bailey**, 511 So.2d 1248, 1250 (La. App. 2nd Cir. 1987), writ denied, 519 So.2d 132 (La. 1988). Further, the jurisprudence has added an aspect of awareness to the offense of La. R.S. 14:95.1. Therefore, the State must also prove that the offender was aware that a firearm was in his presence and that the offender had the general criminal intent to possess the weapon. **State v. LaMothe**, 97-1113 (La. App. 5th Cir. 6/30/98), 715 So.2d 708, 712, cert. granted in part on other grounds, 98-2056 (La. 11/25/98), 722

---

[5] One of the prior felony convictions was in 2012 for possession of a firearm by a convicted felon.

So.2d 987 (per curiam). See **State v. Woods**, 94-2650 (La. App. 4th Cir. 4/20/95), 654 So.2d 809, 811, writ denied, 95-1252 (La. 6/30/95), 657 So.2d 1035. Mere presence of a defendant in the area of the contraband or other evidence seized alone does not prove that he exercised dominion and control over the evidence and therefore had it in his constructive possession. **State v. Johnson**, 2003-1228 (La. 4/14/04), 870 So.2d 995, 999.

Whether the proof is sufficient to establish possession turns on the facts of each case. See **State v. Harris**, 94-0970 (La. 12/8/94), 647 So.2d 337, 338-39 (per curiam); **State v. Bell**, 566 So.2d 959, 959-60 (La. 1990) (per curiam). Further, guilty knowledge may be inferred from the circumstances of the transaction and proved by direct or circumstantial evidence. **Johnson**, 870 So.2d at 998.

In the instant matter, Agent Everly searched the vehicle that the defendant came to his office in that was driven by the defendant's wife. Agent Everly knew the defendant's wife drove the car because the defendant told the agent this when he arrived at his office. Based on the defendant testing positive for marijuana on the drug screen, Agent Everly decided to search the vehicle. Prior to the search, however, Agent Everly saw the defendant's text to his wife, who was still in the vehicle, to "[g]et that gun." This clearly indicated the defendant knew of the presence of the gun in the vehicle.

Agent Howell found and retrieved the gun, a .40 caliber Glock, from the vehicle, and then Agent Everly brought the weapon back to his supervisor's office, where the defendant was located. When Agent Everly asked the defendant about the gun, the defendant explained that his aunt had purchased the gun and gave it to him for protection because he feared for his life. Three witnesses testified at trial that they heard the defendant say he was using the gun for his safety or protection. Accordingly, any fact finder could have rationally concluded the defendant was in constructive possession of the .40 caliber Glock found in the vehicle.

32

The jury heard the testimony and viewed the physical evidence presented to it at trial and found the defendant guilty as charged. In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. **State v. Higgins**, 2003-1980 (La. 4/1/05), 898 So.2d 1219, 1226, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. **State v. Taylor**, 97-2261 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. See **State v. Mitchell**, 99-3342 (La. 10/17/00), 772 So.2d 78, 83.

When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. **State v. Moten**, 510 So.2d 55, 61 (La. App. 1st Cir.), writ denied, 514 So.2d 126 (La. 1987). In finding the defendant guilty, the jury clearly rejected the defense's theory of innocence. See **Moten**, 510 So.2d at 61. The jury's guilty verdict reflected the reasonable conclusion that, based on the evidence, particularly the testimony of Agent Everly, Agent Howell, and Supervisor Lousteau, the defendant constructively possessed the handgun found in his aunt's car. The jury clearly chose to believe this testimony over the testimony of Chelsea, who testified that, until they drove to the post office, the defendant knew nothing about the gun in the car.

Accordingly, the jury had sufficient evidence to conclude that the defendant was aware of the gun and that the gun was under his dominion and control. Such dominion and control is sufficient to constitute constructive possession. See **State v. Storks**, 2002-754 (La. App. 5th Cir. 12/30/02), 836 So.2d 638, 642-43. See also **State v. Allen**, 2012-0412 (La. 10/26/12), 101 So.3d 41, 42-43 (per curiam) (defendant's possession of the car gave him dominion and control over the handgun concealed under the backseat); **State v. Major**, 2003-3522 (La. 12/1/04), 888 So.2d 798, 802-03; **State v. McKinney**, 44,269 (La. App. 2nd Cir. 5/13/09), 12 So.3d 422, 426.

After a thorough review of the record, we find the evidence supports the jury's guilty verdict. We are convinced that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was in constructive possession of a firearm as a convicted felon and that he had the general intent to possess the weapon. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam); **Storks**, 836 So.2d at 643.

This assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 6

In his sixth assignment of error, the defendant argues the trial court erred in imposing a sentence without the benefit of parole.

This claim is baseless. As a second-felony habitual offender with an agreed-upon sentence, the trial court sentenced the defendant to thirty years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The conditions imposed on the sentence are those mandated in the reference statute. See **State v. Bruins**, 407 So.2d 685, 687 (La. 1981); **State v. Thomas**, 2010-1926 (La. App. 1st Cir. 8/10/11), 2011 WL 3806127 at *3 (unpublished). The sentence for possession of a firearm by a convicted felon is without benefit of parole, probation,

34

or suspension sentence. See La. R.S. 14:95.1(B). Accordingly, the trial court's denial of parole eligibility was proper. See La. R.S. 15:529.1(A)(1) & La. R.S. 15:529.1(G).

This assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 7

In his seventh assignment of error, the defendant argues that his conviction should be reversed because he was denied his constitutional right to a complete record of the proceedings in this case.

Article I, § 19 of the Louisiana Constitution guarantees defendants a right of appeal based upon a complete record of all the evidence upon which the judgment is based. Material omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal. **State v. Frank**, 99-0553 (La. 1/17/01), 803 So.2d 1, 20. On the other hand, inconsequential omissions or slight inaccuracies do not require reversal. **Id** at 21. A defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts. **Id.**

The defendant suggests in brief that the record is missing the following: the defendant's requests for subpoenas duces tecum; the multiple returns on those subpoena duces tecum, including the 87 pages of newly discovered evidence on the second day of trial; the first pages of the defense's motion in limine concerning other crimes evidence; and transcripts of almost all bench conferences.

Agent Everly made it clear at trial that defense counsel sent two subpoenas duces tecum for his entire file, and that he turned over the whole file. The trial court noted that it had reviewed the records from the Department of Public Safety and Corrections. The trial court gave the entire probation and parole folder first to the State for it to review for any possible redactions of personal information. The State responded that it was given "87 new pages." Defense counsel was given the same

35

documents, and the trial court informed the parties that it would give them the opportunity over lunch recess to review the records. It appears defense counsel could have, but chose not to, introduce these records into evidence. The record contains the transcripts of the bench conferences that were recorded. On February 28, 2019, this court ordered the Clerk of Court of St. Tammany Parish to supplement the appeal record with the transcript of the conference held in chambers on July 18, 2018, regarding jury instructions. The Clerk of Court responded by letter that the conference was held off record and, as such, there was no transcript. It appears that there may be one missing page to the defendant's motion in limine, but the summary of the facts and the "Law & Argument" section appear in their entirety in the record. Further, the defendant has not shown how this, in any way, was prejudicial to his case.

The evidence against the defendant regarding the instant crime was considerable. Based on the foregoing, to the extent that there have been omissions from the transcript of the proceedings at trial, the appellate record before us is not incomplete. Moreover, an incomplete record may be adequate for full appellate review. Also, there exists a presumption of regularity in judicial proceedings. The defendant herein has not shown any prejudice from any alleged missing portions from the record. See **State v. Hawkins**, 96-0766 (La. 1/14/97), 688 So.2d 473, 480.

This assignment of error is without merit.

**CONVICTION, HABITUAL OFFENDER ADJUDICATION, AND SENTENCE AFFIRMED.**

36